HENRY T. PATTERSON TRUST, by its Trustee, The REEVES BANKING & TRUST COMPANY, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 82–3750.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1983.

Decided March 22, 1984.

Steve Frahm, Tax Div., Dept. of Justice (argued), Glenn L. Archer, Michael L. Paup, Washington, D.C., and J. William Petro, Asst. U.S. Atty., Cleveland, Ohio, for defendant-appellant.

**1090**

Norman S. Buckvar, Benesch, Friedlander, Coplan & Aronoff, Alan Doris (argued), Cleveland, Ohio, for plaintiff-appellee.

Before EDWARDS and KRUPANSKY, Circuit Judges, and PECK, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

The United States of America appeals the decision of the United States District Court for the Northern District of Ohio, Eastern Division, in favor of plaintiff-appellee Henry T. Patterson Trust (Trust) in this action for a refund of federal income taxes with interest. The Trust, by its Trustee, the Reeves Banking & Trust Company (Reeves), instituted this action for a refund of $115,747.98 in federal income taxes paid by the Trust in 1979 for the year 1976, plus interest of $15,805.94 which had accrued as of 1979. The Internal Revenue Service had assessed such taxes on the basis that the amount paid to the Trust for the redemption of all of the Trust's shares in the Puritan Laundry and Dry Cleaning Company (Puritan) should be taxed as a dividend, and not as a sale of stock. The record reveals the following facts.

Prior to 1969, Henry Patterson, Sr. was the sole shareholder and chief executive officer of Puritan. In 1969, he gave forty shares of Puritan stock to each of his children—John, Hank and Ellen. At the time, Ellen was married to Bill Hicks (Hicks), who, along with Hank, was employed by Puritan. Henry Patterson retained 200 shares of Puritan stock.

Bill Hicks was apparently a skilled business manager, while Hank Patterson (Hank) lacked effectiveness. Through the years, a bitter tension between Hicks and Hank developed, resulting in numerous altercations, one of which ended with Hank's hospitalization. At one point, John Patterson (John) participated in the management of the business but, because of the Hank-Hicks rivalry, John resigned and pursued a teaching career.

At trial, there was testimony that Henry Patterson desired that Hicks operate the company after Patterson's retirement. In early 1970, Patterson suffered a broken hip which forced him to remain away from the company. He designated Hicks to act as Puritan's president and general manager in his absence. Patterson's health continued to deteriorate and he died in November 1971.

In June 1971, Hicks presented the Puritan directors with a demand for an increase in salary and a proposal that they place all of the Puritan shares in a voting trust which Hicks would then control. The directors demurred and Hicks resigned. He immediately staged a slowdown of Puritan employees and persuaded the company's most substantial commercial accounts to demand that Puritan rehire him. Within ten days of Hicks' resignation, Puritan was on the verge of collapse. John, who had since returned to the business, contacted Hicks and negotiated a five-year employment contract with him.

Hicks' contract provided an increased salary, a profit sharing arrangement, and a five-year option to acquire eighty shares of Puritan stock. Hicks acquired five of those shares and his option on the remaining seventy-five shares remained open. At the same time, Hank also received a five-year contract.

During the ensuing five years, Puritan performed well but problems between Hank and Hicks became increasingly aggravated; Hank, John, and Ella Patterson, their mother, often were at odds with Hicks and his wife, Ellen.

In the spring of 1976, the Patterson estate was closed. Henry Patterson had placed his 200 shares of Puritan stock in the Henry T. Patterson Trust (Trust) with his widow, Ella, as the beneficiary with the power to appoint the corpus at her death. Following the closing of the estate, the Puritan stock was thus distributed:

| | |
|---|---|
| Henry T. Patterson Trust | 200 shares |
| Ella Patterson | 25 shares |
| Hank Patterson | 40 shares |
| John Patterson | 40 shares |

| Ellen (Patterson) Hicks | 40 shares |
| Bill Hicks | 5 shares |
| Lester Winkler | 6 shares |

Hicks devised a two-step plan whereby he and his wife could obtain control of Puritan. First, Puritan would redeem the Trust shares and, following the redemption, Hicks would exercise his option and acquire an additional seventy-five shares. As a result, Hicks and his spouse would own 120 shares and the remaining shareholders would control only 111 shares, thus Hicks would acquire a controlling interest in Puritan.

The Reeves Bank, as Trustee, determined that if it refused to redeem the shares, Hicks would leave the company and eventually the Trust corpus would be worthless. Thus, acting in what it perceived as the best interests of the Trust and the beneficiary, the Reeves Bank determined to accept the proposed redemption.

On April 2, 1976, the directors were presented with the proposal. The Trustee reported that it would be in Ella's best interest to redeem the shares and invest the proceeds. The minutes report:

> After detailed discussion, it was moved by Wm. Hicks and seconded by [Hank] F. Patterson, that the company purchase the outstanding 200 shares held by the Reeves Banking and Trust Company, in trust for Mrs. Patterson upon the following terms: Price One Hundred Ninety Thousand and no/100 dollars (200 shares $950.00)
>
> $47,500 Down Balance
>
> $47,500 Due January 15, 1977
>
> $47,500 Due January 15, 1978
>
> $47,500 Due January 15, 1979

Following the redemption, on July 7, 1976 Hicks exercised his option and pur- chased seventy-five shares of Puritan stock from the company. Hicks thereafter forced a realignment of the Puritan Board of Directors. Prior to his attaining control, the Directors were:

| Ella Patterson | Ellen Hicks |
| Hank Patterson | Lester Winkler |
| John Patterson | |

Following the consumation of Hicks' plan, the Directors were:

Bill Hicks

Ellen Hicks

Lester Winkler

The Trust reported the transaction as a capital gains sale. Upon review, the Commissioner determined that the amount received by the Trust in the redemption, $190,000.00, was a dividend taxable as ordinary income under § 301 of the Internal Revenue Code of 1954. A deficiency of $115,747.98 plus interest of $15,805.94 was assessed. The Trust paid the deficiency, and, as a result, netted $58,446.08 from the original transaction.

The Trust was denied a refund and instituted the within litigation. The district court rejected the Trust's argument that the transaction amounted to a termination of its interest in Puritan, but accepted the Trust's alternative argument that the transaction was not essentially equivalent to a dividend and was therefore entitled to capital gains treatment. This timely appeal by the United States followed.

The Internal Revenue Code of 1954, 26 U.S.C. § 301, as effective in 1976, provided that "a distribution of property ... made by a corporation to a shareholder" would be taxed as the ordinary income of that shareholder.[1] Section 302 of the Code, 26

---

1. Section 301 provided:
 **Distributions of property**
 (a) **In general.**—Except as otherwise provided in this chapter, a distribution of property ... made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

 \*　　\*　　\*　　\*　　\*　　\*

 (c) **Amount taxable.**—In the case of all distribution to which subsection (a) applies—
 (1) **Amount constituting dividend.**
 —That portion of the distribution which is a dividend ... shall be included in gross income.

 \*　　\*　　\*　　\*　　\*　　\*

 (3) **Amount in excess of basis.**—

U.S.C. § 302, established, however, four exceptions to the general rule that proceeds from a redemption of stock by a corporation shall be treated, for tax purposes, "as a distribution of property to which § 301 applies". As relevant, the 1976 version of § 302 stated:

> (a) **General Rule.**—If a corporation redeems its stock ..., and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
>
> (b) **Redemptions Treated as Exchanges.**—
>
> (1) **Redemptions not equivalent to dividends.**—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.
>
> \* \* \* \* \* \*
>
> (3) **Termination of shareholder's interest.**—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.
>
> \* \* \* \* \* \*
>
> (5) **Application of paragraphs.**—In determining whether a redemption meets the requirements of paragraph (1) the fact that such redemption fails to meet the requirements of paragraphs (2), (3), or (4) shall not be taken into account.
>
> \* \* \* \* \* \*
>
> (d) **Redemptions Treated as Distributions of Property.**—Except as otherwise provided in this subchapter, if a corporation redeems its stock ..., and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which § 301 applies.

Paragraphs (2) [dealing with substantially disproportionate redemptions] and (4) [dealing with railroad stocks] are not applicable. The district court rejected the Trust's arguments pursuant to paragraph (3), and the

> (A) **In general.**—...[T]hat portion of the distribution which is not a dividend ... shall

Trust admitted on appeal that paragraph (3) is not applicable to this redemption. Therefore, at issue here is the propriety, as a matter of law, of the district court's determination that the Trust's redemption was not essentially a dividend, as defined by § 302(b)(1).

In *United States v. Davis,* 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970), the Supreme Court evaluated the intended scope of § 302(b)(1). In that case, a sole shareholder caused part of his shares to be redeemed by the corporation; the Court concluded that such a redemption is always equivalent to a dividend and thus subject to ordinary income tax. However, the Court's examination of § 302(b)(1)'s history is germane to the analysis of this appeal:

> It was clearly proper for Congress to treat distributions generally as taxable dividends when made out of earnings and profits and then to prevent avoidance of that result without regard to motivation where the distribution is in exchange for redeemed stock.
>
> We conclude that that is what Congress did when enacting § 302(b)(1). If a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders. Where a redemption has that same effect, it cannot be said to have satisfied the "not essentially equivalent to a dividend" requirement of § 302(b)(1). Rather, to qualify for preferred treatment under that section, a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation. Clearly, taxpayer here, who (after application of the attribution rules) was the sole shareholder both before and after the redemption, did not qualify under this test.

397 U.S. at 313, 90 S.Ct. at 1048.

As explicated by the Supreme Court, § 302(b)(1) provides that corporate distribu-

be treated as a gain from the sale of property.

tions which do not alter the shareholder's "relative economic interests or rights" will be taxed as a dividend, regardless of the form or nomenclature given the transactions. The test is to examine the change in the taxpayer's relationship to the corporation; § 302(b)(1) is satisfied, under this test, if the examination establishes a "meaningful reduction" of the taxpayer's relative interests or rights in the company.

█ Whether a distribution by redemption of stock was "essentially equivalent to a dividend" for the purposes of the 1954 Code is a question of fact. *Wright v. United States*, 482 F.2d 600 (8th Cir.1973); *United States v. Fewell*, 255 F.2d 496 (5th Cir.1958); 26 C.F.R. 1.302–2(b) (Treasury Regulations). The district court's factual determinations must be upheld on appeal if they are supported by substantial evidence within the record considered as a whole. Federal Rule of Civil Procedure 52(a).

To determine if the district court properly discerned a meaningful reduction in the Trust's interest and rights in Puritan, the starting point must be a comparison of the Trust's relative holdings prior to and after the redemption. As in *United States v. Davis, supra,* this comparison requires application of the attribution statutes.

Briefly stated, the 1954 Code provided that a trust constructively owned its shares plus the shares held by the beneficiary, including those shares which § 318 attributed to the beneficiary. 26 U.S.C. §§ 302(c), 318.[2]

Applying this statute, it is readily apparent that prior to the redemption, the Trust constructively owned 345 shares of the Puritan company, computed from its own shares (200), Ella's holdings (25), and the shares owned by Ella's children (John—40, Hank—40, Ellen Hicks—40). Following the redemption, the Trust's constructive holdings were reduced to 145 shares (25 owned by Ella, 120 held by her children). Only 11 other shares remained actually outstanding (Hicks—5, Winkler—6); therefore, the Trust held 345/356 shares, or 97%, before and 145/156b shares, or 93%, immediately after the redemption.

When the district court made this comparison it included the seventy-five option shares held by Hicks. Accordingly, the district court determined that the Trust held 80% of the company before redemption (345/431), and 62.8% after redemption (145/231). Because the Trust no longer controlled the company after the redemption (holding less than two-thirds of the stock), the district court concluded that the "meaningful reduction" test had been satisfied. The district court included the Hicks option in its calculations pursuant to the

---

**2.** Section 302 provided:

 (c) **Constructive Ownership of Stock—**
 (1) **In general.**— ... [S]ection 318(a) shall apply in determining the ownership of stock for purposes of this section.
 Section 318 relevantly stated:
 **§ 318. Constructive Ownership of Stock.**
 (a) **General Rule.**—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—
 (i) his spouse ... and,
 (ii) his children ... and parents.
 \* \* \* \* \* \*
 (2) **Attribution from ... trusts.**—
 \* \* \* \* \* \*
 (B) **From trusts.**—
 (i) Stock owned, directly or indirectly, by or for a trust ... shall be considered as owned by its beneficiaries....
 (3) **Attribution to ... trusts.**—
 \* \* \* \* \* \*
 (B) **To trusts.**—

 (i) Stock owned, directly or indirectly, by or for a beneficiary of a trust ... shall be considered owned by the trust....
 \* \* \* \* \* \*
 (4) **Options.**—If any person has an option to acquire stock, such stock shall be considered as owned by such person.
 \* \* \* \* \* \*
 (5) **Operating rules.**—
 (A) **In general.**—Except as provided in subparagraphs (B) and (C), stock constructively owned by a person by reason of the application of paragraphs (1), (2), (3), and (4), shall, for purposes of applying paragraphs (1), (2), (3), and (4), be considered as actually owned by such person.
 (B) **Members of family.**—Stock constructively owned by an individual by reason of the application of paragraph (1) shall not be considered as owned by him for purposes of again applying paragraph (1) in order to make another the constructive owner of such stock.

plain language of the attribution statute, 26 U.S.C. § 318(a)(4), which stated [emphasis added]:

> If *any* person has an option to acquire stock, such stock shall be considered as owned by such person.

On appeal, the Government urges that § 318(a)(4) actually applies only to the taxpayer or to individuals whose shares are otherwise attributable to the taxpayer. The Government would therefore greatly narrow the scope of § 318(a)(4). Under the Government's view of the statute, the Trust's ownership interest in Puritan was reduced only 4% as a result of the redemption, from 97 to 93%, which, it contends, was not meaningful as a matter of law.

 "[I]n determining the scope of a statute, one is to look first at its language." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983). *See North Dakota v. United States*, 460 U.S. 300, 103 S.Ct. 1095, 1103, 75 L.Ed.2d 77 (1983); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Further, "[i]t is axiomatic that where a statute is clear and unambiguous on its face, a court will not look to legislative history to alter the application of the statute except in rare and exception circumstances." *Pope v. Rollins Protective Services Co.*, 703 F.2d 197, 206 (5th Cir.1983). *See Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *TVA v. Hill*, 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978); *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930). Finally, "Congress is presumed to use words in their ordinary sense unless it expressly indicates the contrary." *Davis Bros., Inc. v. Donovan*, 700 F.2d 1368, 1370 (11th Cir.1983) *reh. and reh. en banc denied* (Eleventh Circuit re-

fused to allow the Secretary of Labor to interpret "customarily furnished" meals as meaning "voluntarily accepted" meals for purposes of wage provisions in Fair Labor Standards Act). *See Addison v. Holly Hill Fruit Products*, 322 U.S. 607, 617–618, 64 S.Ct. 1215, 1221–22, 88 L.Ed. 1488 (1944).

Nevertheless, the Government invites this court to examine the legislative history of § 318(a)(4) and conclude that "any person" actually means only those "parties in the line of attribution". *See* 26 U.S.C. §§ 318(a)(1)(A), 318(a)(4), *reprinted supra* n. 2. The Government relies on the commentary in the "Detailed Discussion of Bill" portion of the Senate Report relative to § 318(a)(3) [currently effective as § 318(a)(4)]. The commentary describes the operation of the relevant portions of the attributive statute in the following manner:

### § 318. Constructive ownership of stock

This section describes the area in which although in fact transactions related to stock ownership are in connection with a specific individual, ownership of stock is deemed to be in the hands of persons other than the person directly involved. Thus, for the purpose of determining whether a redemption of stock qualifies as a disproportionate redemption ... consideration is given not only to the stock held by such person but also to stock owned by members of his family....

The area of constructive ownership includes members of the family, persons having interests in ... trusts, ... such ... trusts, ... and stock held under an option.

In the family area (sec. 318(a)(1)) an individual is deemed to own stock owned by his parents, his children, and his grandchildren.... In the case of trusts, ... the beneficiary or grantor is deemed to own his proportionate interest in the stock owned by the trust or estate and the trust or estate is deemed to own all of the stock owned by its beneficiaries or grantors.

In any of the cases *above described* where stock, though not owned, is subject to an option, the holder of such option is deemed to own such stock (sec. 318(a)(3)).

S.Rep. No. 1622, 83d Cong., 2d Sess. 45, *reprinted in* [1954] U.S.Code Cong. & Ad. News 4621, 4890–91 [emphasis added].

The Government urges that as a result of the commentary's apparent limitation of the option attribution rule to "the cases above described", "the Senate indicated its intent that § 318(a)(3) (now § 318(a)(4)) should be limited to parties in the line of attribution". The Internal Revenue Service has consistently followed the reasoning herein argued by the Government, *see, e.g.*, Rev.Rul. 68–601, and the tax court has adopted the Service's view as well. *See Sorem v. Commissioner*, 40 T.C. 206 (1963); *Northwestern Steel and Supply Co., Inc. v. Commissioner*, 60 T.C. 356 (1973). However, only two appeals courts have addressed the issue and they, without analysis, adopted diverse positions.

In *Friend v. United States*, 345 F.2d 761 (1st Cir.1965), the First Circuit's *dictum* indicated that that court believed that "Congress intended that section to apply only where options are held by the person whose shares are being redeemed." 345 F.2d at 764. In *Sorem v. C.I.R.*, 334 F.2d 275, 280 (10th Cir.1964), the court, again without analysis, applied the plain language of the options attribution provision of § 318(a), and rejected the Government's view.

■ The Government argues that this court should defer to the Service's consistently-applied interpretation of the Code. However, while it is axiomatic that where statutory language remains vague even when illuminated by the legislative history, the construction offered by the agency charged with the enforcement of the statute will often be accorded dispositive weight, it is an equal principle that the agency may not so interpret the statute as to controvert its plain and unambiguous language. Except in "rare and exceptional circumstances", *Rubin v. United States*,

*supra*, such as where Congress "expressly indicates" its intent that the plain meaning of the statutory language be avoided, *Davis Bros., Inc. v. Donovan, supra*, unambiguous statutory language "is to be regarded as conclusive". *Dickerson v. New Banner Institute, supra*.

■ Instantly, the Government asserts only the commentary of the Senate Report, reprinted above, as support for its construction of "any person" in § 318(a)(4). The commentary falls short of a clear indication by Congress that the natural impact of the statutory language under review should be restrained. Accordingly, the district court appropriately included the option shares held by Hicks in determining the Trust's relative holdings prior to and following redemption.

It should be noted that, even if the Hicks shares were excluded, on the instant record the district court would have been entitled to enter the factual finding that the transaction under review was not essentially equivalent to a dividend and was therefore properly claimed as a capital gain. "The question whether a distribution in redemption of stock ... is not essentially equivalent to a dividend ... depends upon the facts and circumstances of each case." 26 C.F.R. § 1.302–3(b) (1983 Treasury Regulations); *United States v. Davis, supra*. Obviously, *one* of the pertinent facts would be the relative holdings of the taxpayer as computed under § 318's constructive stock ownership provisions, 26 C.F.R. § 1,302(b), *United States v. Davis*, however, neither statutory enactment nor judicial construction would support the proposition that the resulting comparative calculation would become the exclusive and dispositive fact. In this case, the redemption effected "a change in the relative economic interests or rights" of all the stockholders of the Puritan company. Therefore, despite the fact that—excluding operation of § 318(a)(4)— the Trust's relative holdings fell only 4% after redemption, under the unique facts and circumstances of this case, such was a "meaningfuly reduction" and the distribution was therefore not a dividend.

Accordingly, because substantial evidence supports the district court's factual determination that the transaction was not essentially equivalent to a dividend, the judgment below is AFFIRMED.