923 F.2d 1183
 59 USLW 2460
 Tim BOETTGER, Becky Boettger, individually and as Next
Friend for their Minor Daughter, Amanda Boettger,
Plaintiffs-Appellees,
v.
Otis R. BOWEN, Secretary of Health and Human Services
(89-1832); and C. Patrick Babcock, Director,
Michigan Department of Social Services
(89-1831), Defendants-Appellants.
 Nos. 89-1831, 89-1832.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 4, 1990.
Decided Jan. 17, 1991.
Rehearing and Rehearing En Banc
Denied March 6, 1991.
 
 Jacqueline Doig (argued) and Terri L. Stangl, Legal Services of Eastern Michigan, Saginaw, Mich., for plaintiffs-appellees.
 John Cordes, Constance A. Wynn (argued), Dept. of Justice Appellate Staff, Civ. Div., Washington, D.C., and Janet L. Parker, Asst. U.S. Atty., Office of the U.S. Atty., Bay City, Mich., for Secretary of Health and Human Services.
 John M. Konwinski, Asst. Atty. Gen., Office of the Atty. Gen. and Louis J. Caruso, Sol. Gen., Lansing, Mich., for C. Patrick Babcock.
 Before GUY and RYAN, Circuit Judges, and ENGEL, Senior Circuit Judge.
 RALPH B. GUY, JR., Circuit Judge.
 
 
 1
 Defendants, the Secretary of Health and Human Services and Michigan's Director of the Department of Social Services (DDS), appeal the district court's summary judgment for plaintiffs in this statutory construction case involving the Aid to Families with Dependent Children program. We are asked to decide whether the district court erred in holding that a federal regulation, 45 C.F.R. Sec. 224.51, allowing sanctions for termination of employment contravenes the authorizing statute, 42 U.S.C. Sec. 602(a)(19)(F), and whether the district court erred in holding that the Michigan policy of sanctioning work incentive program participants who terminate employment contravenes 42 U.S.C. Sec. 602(a)(19)(F).
 
 
 2
 We hold that both the federal regulation and the Michigan policy allowing sanctions for termination of self-obtained employment fall within the authorization grant of 42 U.S.C. Sec. 602(a)(19)(F). We shall, therefore, reverse the judgment of the district court.
 
 I.
 
 3
 Plaintiffs' suit challenges a reduction in the family's Aid to Families with Dependent Children-Unemployed Parent (AFDC-U) benefits. On February 14, 1987, at a time when the Boettger family was receiving AFDC-U benefits, Mr. Boettger obtained a job through his own efforts. However, Mr. Boettger voluntarily terminated that employment two days later--a termination determined by Michigan's DDS to be "without good cause." The Michigan Department of Social Services notified the Boettger family that, in compliance with a state sanction policy, their AFDC-U benefits would be terminated for three months.
 
 
 4
 Plaintiffs filed suit to enjoin the termination of benefits. The district court found that the federal regulation, 45 C.F.R. Sec. 224.51, and Michigan's policy of imposing sanctions in this type of situation contravened the federal authorizing statute, 42 U.S.C. Sec. 602(a)(19)(F).[1] The district court granted summary judgment for plaintiffs on those two issues, 714 F.Supp. 272, and enjoined defendants from imposing AFDC-U sanctions against plaintiffs for the termination in question.
 
 II.
 
 5
 The AFDC program is a cooperative federal-state effort established by Congress in 1935 to enable each state to furnish financial assistance to certain needy children and the parents or relatives with whom they live. The goals of the AFDC program are to "help maintain and strengthen family life" and to assist "parents or relatives to attain or retain capability for the maximum self-support and personal independence." 42 U.S.C. Sec. 601.
 
 
 6
 States are not required to participate in the AFDC program, but states wishing to do so must submit plans to the Secretary for approval. 42 U.S.C. Sec. 602(b). If the Secretary approves the state plan, the state becomes eligible for approximately half of the program's funding from the federal government. 42 U.S.C. Sec. 603. The AFDC program is administered locally by states, which must comply with federal requirements governing the operation of the program. See King v. Smith, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141 n. 34, 20 L.Ed.2d 1118 (1968).
 
 
 7
 In 1967, Congress made significant changes to the AFDC program, including the creation of the Work Incentive Program (WIN). 42 U.S.C. Sec. 630 et seq. The purpose of the WIN program is to encourage AFDC recipients to seek and retain employment and to become independent. As expressed by Congress, the program is designed "to assist participants in securing and retaining employment and securing possibilities for advancement." 42 U.S.C. Sec. 633(d).
 
 
 8
 Most AFDC recipients over 16 years of age are required to register under the WIN program in order to receive benefits, and Mr. Beottger was a mandatory WIN registrant.[2]
 
 
 9
 The federal statutory provision at issue, 42 U.S.C. Sec. 602(a)(19)(F), sets forth sanctions applicable to WIN program participants. The statute mandates that any state participating in the program provide for sanctions in two instances: (1) when an individual has "refused without good cause to participate under a work incentive program"; or (2) when an individual has "refused without good cause to accept employment ... offered through the public employment offices of the State, or ... otherwise offered by an employer."[3]
 
 
 10
 Both the federal regulation and the Michigan state policy allow sanctions in other situations, including termination of employment. The federal regulation, 45 C.F.R. Sec. 224.51(a), provides that sanctions may be imposed in four instances: when an individual (1) has "failed or refused without good cause to participate in the program"; (2) has "terminated employment"; (3) has "refused to accept employment"; or (4) has "reduced earnings without good cause." Id.[4] Thus, the federal regulation allows sanctions in two situations not specifically mentioned in the authorizing statute: termination of employment and reduction of earnings without good cause. The state policy defines a voluntary termination of a job obtained through state or individual efforts as a noncompliance action and allows sanctions for such noncompliance.[5]
 
 III.
 
 11
 Defendants argue that the federal regulation is based on a reasonable construction of the relevant statute and that the district court erred by failing to defer to the Secretary's interpretation. Defendants further claim that the district court incorrectly used a "formalistic interpretation" of the statute, an interpretation that "conflicts with the expressed objectives of the WIN program."
 
 
 12
 For the federal regulation and the state policy to be valid, they must be consistent with the statutory purpose. To the extent they are inconsistent with the controlling statute, they are invalid. King v. Smith, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141 n. 34, 20 L.Ed.2d 1118 (1968). It is hard to argue that the regulations are not consistent with the overall purpose of the WIN legislation to reduce welfare costs and return AFDC recipients to gainful employment. Plaintiffs argue not so much "statutory purpose" as they do "plain meaning." Put another way, even after a court looks to the broad purpose of a statute, it still must give effect to the words actually used by Congress to achieve that purpose.
 
 
 13
 Not all problems of statutory interpretation are the same, however. Sometimes Congress uses language which is ambiguous or internally inconsistent. At other times, it uses language which is general to the point that some interpretation is required. The immediate audience is not always the same either. Criminal statutes, for example, must provide clear cut directives to all persons. There is no intermediary to provide further clarification between Congress and the persons who are subject to penalty.
 
 
 14
 General welfare statutes, on the other hand, almost always involve Congress speaking in the first instance to an intermediary, and that intermediary is usually a federal agency. Congress, in effect, says to the federal agency, "Here is what we want to do--see that it's done!" It is up to the federal agency to put some flesh on the skeleton, and this is the reason why federal agencies have the authority to promulgate rules and regulations. Agency action generally does not stem from any desire to usurp the legislation function but, rather, is mandated by the necessarily incomplete marching orders received. It seems to us that this is particularly true in a situation, such as we have here, where the agency must not only discern the intention of Congress but also must itself promulgate rules and regulations to follow for states who wish to participate in the program.
 
 
 15
 It is not at all unusual or illogical then that the rule has emerged that courts should follow an agency's construction of a statute unless "there are compelling reasons that [the agency interpretation] is wrong." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Although this rule is often justified on the basis of agency "expertise," that certainly is not the only justification for the rule. The agencies are compelled to interpret congressional enactments in order to carry forward the programs mandated by Congress. The courts should not thwart them in their mission unless it is clear they have exceeded their legislative charter or in some way offended the Constitution. What then does all this lead to when applied to the facts here?To begin with, Mr. Boettger was on notice that, if without good cause he terminated the job he secured on his own, he was subject to sanctions. The state regulations spell that out in no uncertain terms. Second, he did quit his job without good cause, and makes no challenge to that determination or the procedures afforded to reach that determination. In fact, the only argument Boettger has is a variation on the old "lead a horse to water" theme; you can lead a man to a job, but you cannot make him keep it. Since the purpose of the federal program is to put welfare recipients back into the mainstream, it would seem that the ability of a recipient to terminate employment at his or her election is totally inconsistent with the aims of Congress. The justifications that plaintiffs urge for this illogical result are three in number.
 
 
 16
 First, Boettger argues that Congress did not use the word "terminate" when discussing sanctions; therefore, it is conduct that Congress did not intend to be sanctionable. As our previous discussion of congressional intent might presage, we find this argument bordering on the disingenuous. It would make no sense to spend millions of dollars of public money helping people find a job if they could simply quit at their pleasure without sanction. To our minds, it is not stretching the language used by Congress to hold that one who takes a job and then quits two days later has "refused without good cause to accept employment."
 
 
 17
 Second, Mr. Boettger contends that since he found this job himself he ought to be able to quit when he wants. If not, argues Boettger, no one will look for a job on his own. Whatever superficial appeal this proposition may have in the abstract vanishes when it is placed in the context of the WIN program. Mr. Boettger is certainly free to find and quit as many jobs as he sees fit, so long as he does not ask to be supported by public funds in the process. It would be the antithesis of congressional intent to set up a program in which it was the responsibility of the state to find work for the unemployed to the exclusion of their own efforts.
 
 
 18
 Plaintiffs' last argument is that, since 42 U.S.C. Sec. 602(a)(8)(B) specifically refers to termination of employment without good cause, the omission of similar language from 42 U.S.C. Sec. 602(a)(19)(F) must be meaningful. We agree, except we attach a different meaning to it than that offered by the plaintiffs. Section 602(a)(19)(F) deals with the sanctions that are to be imposed in the event an aid recipient refuses to participate in the WIN program or refuses employment offered. Section 602(a)(8)(B), on the other hand, involves that part of the statute which deals with what income is to be counted and what income is to be disregarded in determining entitlement to benefits. Thus, section 602(a)(8)(B) provides in relevant part:
 
 
 19
 (B) provide that (which respect to any month) the State agency--
 
 
 20
 (i) shall not disregard, under clause (ii), (iii), or (iv) of subparagraph (A), any earned income of any one of the persons specified in subparagraph (A)(ii) if such person--
 
 
 21
 (I) terminated his employment or reduced his earned income without good cause within such period (of not less than thirty days) preceding such month as may be prescribed by the Secretary;
 
 
 22
 (II) refused without good cause, within such period preceding such month as may be prescribed by the Secretary, to accept employment in which he is able to engage which is offered through the public employment offices of the State, or is otherwise offered by an employer if the offer of such employer is determined by the State or local agency administering the State plan, after notification by the employer, to be a bona fide offer of employment....
 
 
 23
 42 U.S.C. Sec. 602(a)(8)(B) (1990 Supp.). Although the language is not the easiest to understand, when "translated," it simply means that you cannot quit a job or refuse a job to become eligible for benefits. It is difficult to see how these provisos support an argument that, when one is already receiving benefits from the program, terminating employment is to be disregarded. If anything, we believe the language used in the eligibility criteria supports the Secretary's interpretation of the language in the sanctions section.
 
 
 24
 The summary judgment granted to the plaintiffs is REVERSED.
 
 
 25
 RYAN, Circuit Judge, dissenting.
 
 
 26
 Although it is certainly indisputable that "it would make no sense to spend millions of dollars of public money helping people find a job if they could quit at their pleasure without sanction," the question before us, it seems to me, is whether Congress provided sanctions for people who do just that. While it would have been sensible for Congress to authorize sanctions for a benefit recipient who finds a job and then without just cause quits it, I think Congress did not do so. For reasons best known to that body, it limited the Secretary's authority to impose sanctions to two very specific circumstances, and quitting a job obtained through one's own efforts is not one of them, although common sense may suggest it ought to be.
 
 
 27
 The majority opinion observes that "[f]or the federal regulation and the state policy to be valid, they must be consistent with the statutory purpose" and, to the extent they are inconsistent with that purpose, they are invalid. While that is certainly true, it is rather beside the point. The more fundamental question is whether the federal regulation and the state policy in this case are consistent with the language of the authorizing statute. In determining the validity of an agency regulation said to be authorized by statute, we are concerned, as a general rule, with what Congress said, not what it meant, probably meant, or ought to have meant. Thus, "[i]n determining whether a challenged regulation is valid, a reviewing court must first determine if the regulation is consistent with the language of the statute." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). In my judgment, the federal regulation and the state policy here in question are not consistent with the authorizing statute.
 
 I.
 
 28
 To decide whether a federal regulation is consistent with the authorizing legislation, we look first to the statutory language in an effort to determine its plain meaning. Bradley v. Austin, 841 F.2d 1288, 1293 (6th Cir.1988); Patterson Trust v. United States, 729 F.2d 1089, 1094 (6th Cir.1984). See also North Dakota v. United States, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983); Dickerson v. New Banner Inst., 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983). "Except in 'rare and exceptional circumstances,' such as where Congress 'expressly indicates' its intent that the plain meaning of the statutory language be avoided, unambiguous statutory language 'is to be regarded as conclusive.' " 729 F.2d at 1095 (citations omitted).
 
 
 29
 Section 602(a)(19)(F) provides that sanctions may be imposed in two instances: (1) when an individual has "refused without good cause to participate under a work incentive program"; or (2) when an individual has "refused without good cause to accept employment ... offered through the public employment offices of the State, or ... otherwise offered by an employer...." 42 U.S.C. Sec. 602(a)(19)(F). Sanctions were imposed on the Boettger family because Mr. Boettger quit a job he obtained through his own efforts. For the federal regulation and the state policy to be valid under the statutory grant of authority, terminating self-obtained employment must fall within the meaning of "refus[al] ... to participate" in a work incentive program or "refus[al] ... to accept employment."
 
 
 30
 The district court concluded that the plain meaning of the statutory language does not apply to the termination of employment one obtains on his own. A termination, the court held, is not a refusal to accept employment.
 
 
 31
 In this case, the plain meaning of the various words suggests that "refuse to accept" is not the equivalent of "terminate" and "reduce." As a matter of logic and common understanding, one cannot terminate or reduce something that one has not accepted. Acceptance is a pre-condition to termination or reduction. Thus, a refusal to accept is a precursor to, not the equivalent of, a termination or a reduction.[3]
 
 
 32
 The district court also concluded that in quitting a job he obtained on his own, Mr. Boettger did not refuse to participate in MOST, Michigan's WIN program.
 
 
 33
 Actions beyond the statutory definition of a "work incentive program," however, e.g., obtaining self-initiated employment, cannot logically be construed as participation in a "work incentive program." Similarly, the cessation of such activity cannot logically be regarded as equivalent to a "refus[al] without good cause to participate under a work incentive program."
 
 
 34
 I agree.
 
 
 35
 "Congress is presumed to use words in their ordinary sense unless it expressly indicates the contrary." 729 F.2d at 1094 (citation omitted). As The Supreme Court has explained, "legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." Addison v. Holly Hill Fruit Prods. Inc., 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944).
 
 
 36
 In determining that the statutory language did not authorize sanctions for Boettger's termination, the district court relied on the "common understanding" and the dictionary definitions of the words used. Both are legitimate, perhaps the most legitimate, sources available for determining what the statutory language means. The statutory terms, "refuse to accept" and "terminate," are common terms used here in a simple and straightforward manner and they are not synonymous. As the district court noted, a refusal to accept is a precursor to, rather than the equivalent of, a termination. The unambiguous statutory language, read in its common and generally understood sense, rather plainly does not authorize sanctions for a termination of self-obtained employment and appellants do not claim that a literal straightforward reading of the statutory language, unaided by interpretation, warrants any other conclusion. They argue instead that common sense suggests that Congress must have intended to authorize sanctions, given its overall purpose in enacting the legislation. It would appear that my colleagues agree. But, as the Supreme Court said in Commissioner of Internal Revenue v. Asphalt Prods. Co., 482 U.S. 117, 107 S.Ct. 2275, 96 L.Ed.2d 97 (1987):
 
 
 37
 Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided.
 
 
 38
 482 U.S. at 121, 107 S.Ct. at 2278 (emphasis added).
 
 
 39
 The familiar and well settled canon, of course, is that plain and unambiguous statutory language admits of no interpretation or construction to explain or extend its meaning and must be applied as written, whether agreeable to a court's notion of common sense or not. K Mart Corp., 486 U.S. at 291-92, 108 S.Ct. at 1817-18.
 
 
 40
 Eschewing application of the language of section 602(a)(19)(F) as written, my colleagues have acceded to the appellant's request that we adopt a "functional" definition of the term "refusing to accept" employment so that it will include "terminating" employment. Congress indicated that it understood the difference in the meaning of those expressions when it explicitly distinguished between terminations and refusals to accept employment in another provision of the same statute, 42 U.S.C. Sec. 602(a)(8)(B). It provided in section 602(a)(8)(B) that, in determining the income of an individual claiming benefits, the state agency should not disregard income if the individual: (1) "terminated his employment or reduced his earned income without good cause"; (2) "refused without good cause ... to accept employment ... offered through the public employment offices of the State, or ... otherwise offered by an employer"; or (3) "failed without good cause to make a timely report ... of earned income."[1] As illustrated by provisions (I) and (II) of section 602(a)(8)(B)(i), Congress clearly recognized a difference between terminating employment and refusing to accept employment. That suggests rather forcefully that Congress acted purposefully when it designated refusing to accept employment but not terminating employment as a sanctionable action in section 602(a)(19)(F).
 
 
 41
 Appellants argue, however, that the inclusion of "terminating" employment in section 602(a)(8)(B) and its exclusion from section 602(a)(19)(F) is "not significant" because section 602(a)(8)(B) includes different time periods applicable to terminations and refusals to accept while section 602(a)(19)(F) requires no time differentials. I find that argument unpersuasive. Since Congress specifically imposed a penalty, albeit in a different eligibility context in the statute, for a benefit recipient who "terminate[s] his employment," its failure to make termination of employment in section 602(a)(19)(F) a sanctionable action can only be taken as intentional.
 
 
 42
 "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." INS v. Cardoza-Fonseca, 480 U.S. 421, 432, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987) (quoting Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)).
 
 
 43
 Appellants also argue that a literal application of the statutory language, or as appellants characterize it, a "formalized approach[,] leads to absurd results" and, thus, that approach should be abandoned in favor of a statutory reading that leads to a result in keeping with "the WIN program's objectives." I recognize the exception to the rule that plain, unambiguous statutory language is conclusive, as established in Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), but the exception is inapplicable in this case.
 
 
 44
 The exception that allows plain, unambiguous statutory language to be applied in a manner other than as directed by its plain meaning, the Holy Trinity exception, has been said to apply only in "rare and exceptional circumstances," Rubin v. U.S., 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), or "[w]here the plain language of the statute would lead to 'patently absurd consequences,' that 'Congress could not possibly have intended.' " Public Citizen v. United States Dep't of Justice, [491 U.S. 440] 109 S.Ct. 2558, 2574 [105 L.Ed.2d 377] (1989) (Kennedy, J., concurring) (citations omitted).
 
 
 45
 Applying the plain meaning of the language in section 602(a)(19)(F) does not lead, as appellants claim, to an absurd result. Congress indicated that AFDC benefits are to be provided to parents or relatives of needy dependent children in order "to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection...." 42 U.S.C. Sec. 601. Congress also defined one of the purposes of WIN programs as "the employment of such individual [one receiving AFDC benefits] in the regular economy." 42 U.S.C. Sec. 630.
 
 
 46
 Sanctioning benefit recipients who refuse to accept offered employment or refuse to participate in a WIN program comports with those congressional goals, particularly when participation includes not terminating employment obtained through the efforts of the state agency. Not sanctioning a benefit recipient who exerts the effort to find a job but then quits it is not "patently absurd" and not beyond the realm of possible consequences intended by Congress. The Boettgers offered a very plausible reason why Congress meant what it said in section 602(a)(19)(F):
 
 
 47
 By punishing AFDC recipients who, although not required to do so, make efforts to find and take employment but do not ultimately keep the job, the Secretary and the state welfare agency convey the message that it is better not to try than to try and fail. In the present case, there is no question that the Boettger family would have avoided the loss of their income if Mr. Boettger had never made the effort to find a job and to work at Medco. The regulation discourages initiative and encourages welfare recipients to search for work only if they are forced to do so as a mandatory assignment under the WIN program.
 
 
 48
 The result of applying the plain language of the statute, literally, is not "patently absurd."
 
 II.
 
 49
 Appellants claim the district court's "formalistic interpretation" of 602(a)(19)(F) is incorrect because it conflicts with the "expressed objectives of the WIN program." They argue that the statute was enacted to promote increased independence and employment of benefit recipients, and that "the statutory language prohibiting refusal to accept employment carries with it the necessary implication that one cannot accept employment briefly, and then quit. Otherwise, the statute would be entirely meaningless." I do not agree.
 
 
 50
 Appellants' argument, in a nutshell, is that the overall purpose of the statutory scheme providing AFDC benefits requires a holding that the scope of section 602(a)(19)(F) is broad enough to allow sanctions for Boettger's termination. The Supreme Court has addressed the matter of invoking the "plain purpose" approach to analyzing legislation:
 
 
 51
 The "plain purpose" of legislation, however, is determined in the first instance with reference to the plain language of the statute itself. Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.
 
 
 52
 Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 373-74, 106 S.Ct. 681, 688-89, 88 L.Ed.2d 691 (1986) (citation omitted). See also INS v. Cardoza-Fonseca, 480 U.S. at 431, 107 S.Ct. at 1213. Courts may not properly extend statutory language beyond its plain meaning in order to reach a result that is consistent with Congress' probable intention. Our business is to determine what Congress said, not what it probably intended.[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice--and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law. Where, as here, "the language of a provision ... is sufficiently clear in its context and not at odds with the legislative history, ... '[there is no occasion] to examine the additional considerations of "policy" ... that may have influenced the lawmakers in their formulation of the statute.' "
 
 
 53
 Rodriguez v. United States, 480 U.S. 522, 525-26, 107 S.Ct. 1391, 1393-94, 94 L.Ed.2d 533 (1987) (citation omitted). The plain language of section 602(a)(19)(F) is at odds with appellants' "legislative purpose" argument.
 
 III.
 
 54
 Appellants argue that the district court erred by not giving sufficient deference to the Secretary's interpretation of section 602(a)(19)(F). Again, I disagree.
 
 
 55
 The Supreme Court has established a framework for analyzing an agency's construction of a statute it administers:
 
 
 56
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 
 Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (citations and footnotes omitted). Since Congress has spoken plainly and directly to the issue of sanctionable actions by benefit recipients, "that is the end of the matter."
 The majority opinion grants deference to the Secretary's statutory interpretation even though the Secretary's position conflicts with the plain meaning of the statutory language. In my judgment, we are not free to do so. "The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." K Mart Corp. v. Cartier, Inc., 486 U.S. at 291, 108 S.Ct. at 1817 (citations omitted). "Of course, if Congress has clearly expressed an intent contrary to that of the Agency, our duty is to enforce the will of Congress." Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (citations omitted). See also ETSI Pipeline Project v. Missouri, 484 U.S. 495, 516-17, 108 S.Ct. 805, 816-17, 98 L.Ed.2d 898 (1988); INS v. Cardoza-Fonseca, 480 U.S. at 445-48, 107 S.Ct. at 1220-22.
 The interpretation put on the statute by the agency charged with administering it is entitled to deference, but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.
 Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 31-32, 102 S.Ct. 38, 41-42, 70 L.Ed.2d 23 (1981) (citations omitted).
 For all the foregoing reasons, I conclude that the majority's holding that terminating self-obtained employment is within the scope of the statutory provisions allowing sanctions for refusing to accept employment or refusing to participate in a WIN program is inconsistent with the statutory language.
 I would AFFIRM the judgment of the district court.
 
 
 [1]
 The court, pursuant to United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), dismissed without prejudice plaintiffs' state law claim that the Michigan practice violated Michigan law
 
 
 [2]
 Persons who are working at least 30 hours per week are exempt from registering under the federal statute. 42 U.S.C. Sec. 602(a)(19)(A)(vii). However, the Michigan work incentive demonstration project only exempts persons working at least 40 hours per week. 1986 Mich.Pub.Act No. 134 Sec. 25(i). Congress has authorized the Secretary to waive certain requirements if the state requests, and the Secretary has approved Michigan's modification of the full-time work exemption. 42 U.S.C. Sec. 1315(b)(2)(A)
 
 
 [3]
 42 U.S.C. Sec. 602(a)(19)(F) (1990 Supp.) provides in relevant part:
 A State plan for aid and services to needy families with children must--
 (19) provide--
 ....
 (F) that if ... any ... individual has been found by the Secretary of Labor under section 633(g) of this title to have refused without good cause to participate under a work incentive program established by part C of this subchapter with respect to which the Secretary of Labor has determined his participation is consistent with the purposes of such part C, or to have refused without good cause to accept employment in which he is able to engage which is offered through the public employment offices of the State, or is otherwise offered by an employer if the offer of such employer is determined, after notification by him, to be a bona fide offer of employment--
 ....
 (ii) if the parent who has been designated as the principal earner, for purposes of section 607 of this title, makes such refusal, aid will be denied to all members of the family....
 
 
 [4]
 45 C.F.R. Sec. 224.51(a) provides in relevant part:
 A State plan under Title IV-A of the Act shall provide that:
 (a) When an AFDC recipient, who is a mandatory registrant in the WIN program, has been found to have failed or refused without good cause to participate in the program or has terminated employment, or has refused to accept employment or reduced earnings without good cause ... sanctions shall apply....
 
 
 [5]
 The Michigan DSS Services Manual, item 402 at 7-9, sets forth the state policies relevant to Michigan's WIN program, the Michigan Opportunity & Skills Training program (MOST):
 MOST registrants are subject to work requirement compliance as long as they are receiving public assistance.
 ....
 Non-Compliance may occur in the MOST program when a registrant:
 
 
 [1]
 Demonstrates by repeated failures (more than one) to participate in a work/training assignment
 
 
 [2]
 Demonstrates an overt refusal to participate. A single occasion of such a refusal constitutes non-compliance and a good cause determination must follow. Some examples are
 Voluntarily quits a job, whether or not it was obtained through MOST Program participation.
 
 
 [3]
 This distinction is also reflected in the dictionary definitions of the words. "Accept" is defined in anticipatory terms that suggest a precondition ("to undertake the responsibility of"), whereas "terminate" and "reduce" are defined in conclusory terms ("to bring to end, ... to discontinue"; "to diminish in size, amount, extent, or number."). See Webster's New Collegiate Dictionary (9th ed. 1985)
 
 
 [1]
 The relevant provisions of section 602(a)(8)(B) provide:
 A State plan for aid and services to needy families with children must--
 (B) provide that (with respect to any month) the State agency--
 (i) shall not disregard, under clause (ii), (iii) or (iv) of subparagraph (A), any earned income of any one of the persons specified in subparagraph (A)(ii) if such person--
 (I) terminated his employment, or reduced his earned income without good cause within such period (of not less than thirty days) preceding such month as may be prescribed by the Secretary;
 (II) refused without good cause, within such period preceding such month as may be prescribed by the Secretary, to accept employment in which he is able to engage which is offered through the public employment offices of the State, or is otherwise offered by an employer if the offer of such employer is determined by the State or local agency administering the State plan, after notification by the employer, to be a bona fide offer of employment; or
 (III) failed without good cause to make a timely report (as prescribed by the State plan pursuant to paragraph (14)) to the State agency of earned income received in such month[.]
 42 U.S.C. 602(a)(8)(B)(i).
 
 
 [9]
 The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect