**DANVERS PATHOLOGY ASSOCIATES, INC., et al., Plaintiffs, Appellees,**

v.

**Charles ATKINS, Commissioner, etc., et al., Defendants, Appellants.**

No. 84–1675.

United States Court of Appeals, First Circuit.

Heard Dec. 3, 1984.

Decided March 19, 1985.

Ellen J. Janos, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief for defendants, appellants.

Barbara L. Moore, Boston, Mass., with whom Cooley, Manion, Moore & Jones, P.C., Boston, Mass., was on brief for plaintiffs, appellees.

Before COFFIN and BREYER, Circuit Judges, and MALETZ,* Senior Judge.

BREYER, Circuit Judge.

The issue in this case is whether a provision of the federal Medicaid statute, 42 U.S.C. § 1396a(a)(32), requires a state to furnish Medicaid payments directly to a

* Of the United States Court of International Trade, sitting by designation.

financially independent pathology laboratory, instead of paying the hospital in which the laboratory is physically located. The statute says that the state cannot pay "anyone other than ... [the] individual or the person or institution providing ... [the medical] care or service...." *Id.* The district court said that this statute means the state must pay the laboratory directly, for the laboratory provides the service. We see nothing in the statute's language or purpose, however, that prevents the state from viewing *both* the hospital *and* the laboratory as "institution[s] providing ... [the] service"—in which case the statute does not require payment to the laboratory instead of the hospital. We therefore reverse the district court.

## I

a. A little statutory background will help place the legal issue in perspective. Medicaid is a joint federal-state program that provides federal money for medical assistance to those "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. A participating state must have a "State plan" that meets the requirements of the federal medicaid statute, *see* 42 U.S.C. § 1396a, and the relevant federal regulations promulgated by the Secretary of Health and Human Services, *see* 42 C.F.R. §§ 430.0 *et seq.* (1984). Within the confines of the statute, rules, and regulations, the states enjoy considerable flexibility in fashioning their own reimbursement systems. *See Michael Reese Physicians & Surgeons, S.C. v. Quern*, 606 F.2d 732, 735 (7th Cir.1979) ("Medicaid is an experiment in cooperative federalism, which literally abounds with options") (citations omitted), *reheard in banc*, 625 F.2d 764 (1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981); *Arkansas Pharmacists Association v. Harris*, 627 F.2d 867, 869 (8th Cir.1980); *Massachusetts Hospital Association, Inc. v. Harris*, 500 F.Supp. 1270, 1274 (D.Mass.1980).

To obtain Medicaid reimbursement in Massachusetts, a person or entity providing service must enter into a "provider agreement" with the state and obtain a "provider number." *See* 42 U.S.C. § 1396a(a)(27); 106 C.M.R. § 433.403. Under relevant state regulations, the state will not issue a "provider number" to a laboratory unless it is "independent." 106 C.M.R. § 401.403; 114.3 C.M.R. § 20.02(2). And, by the word "independent" the regulations do not simply mean *"financially independent."* Rather, they specify that, even if separately owned, a laboratory "which: (1) Is located in a hospital ... and (2) serves the hospital's patients, is not an independent laboratory." 42 C.F.R. § 405.-1310(a); *see* 114.3 C.M.R. 20.02(4). Hence, state regulations mean that such a laboratory cannot be reimbursed *directly.*

State regulations nonetheless provide reimbursement for a "nonindependent" laboratory located in a hospital. The Massachusetts Commissioner of Public Welfare (who administers Medicaid) typically issues a provider number to the hospital. The hospital can submit the laboratory's costs, along with other costs, to the Massachusetts Rate Setting Commission. The Commission uses these costs in establishing an all-inclusive *per diem* rate for hospital reimbursement, an appropriate portion of which the hospital can pass on to the laboratory.

The Commissioner prefers this indirect reimbursement system to a direct reimbursement system because it saves money. It avoids the costs of processing thousands of additional, separate reimbursement claims, and it provides greater incentives for the hospital to monitor laboratory efficiency and to hold down laboratory costs. *Cf. College of American Pathologists v. Heckler*, 734 F.2d 859, 865–66 (D.C.Cir. 1984) ("spin off" of laboratory services may significantly increase Medicare costs). The Commissioner also notes that the Medicaid statute strongly encourages states to design innovative reimbursement systems to hold down hospital costs. *See, e.g.,* H.R. Rep. No. 158, 97th Cong., 1st Sess. 293.

In sum, the Commonwealth has designed a cost-saving reimbursement system that,

in its view, falls within the scope of "flexibility" that federal law allows the states. That system does not authorize direct reimbursement to laboratories located within a hospital and serving the hospital's patients.

b. Danvers Pathology Associates, Inc. owns and operates a laboratory located in Hunt Memorial Hospital. It is financially independent of Hunt. But, because of its location and the fact that it serves Hunt patients, it is not "independent" under the terms of the relevant regulations. The Commissioner refused to give Danvers a provider number and insisted that it seek indirect reimbursement through Hunt.

Danvers sued the Commissioner seeking an injunction requiring him to give Danvers a provider number. Danvers advanced several statutory and constitutional arguments, but the district court ruled on only one issue. The court found that a particular federal statutory provision, § 1396a(a)(32) of the federal Medicaid statute, *required* the Commissioner to reimburse Danvers directly. Hence it issued an injunction in Danvers' favor. The Commissioner appeals.

## II

The relevant statutory provision, in pertinent part, says that a state Medicaid reimbursement plan must:

(32) *provide that no payment under the plan* for any care or service provided to an individual *shall be made to anyone other than such individual or the person or institution providing such care or service,* under an assignment or power of attorney or otherwise; except that—

(A) in the case of any care or service provided by a physician, dentist, or other individual practitioner, such payment may be made (i) to the employer of such physician, dentist, or other practitioner if such physician, dentist, or practitioner is required/as a condition of his employment to turn over his fee for such care or service to his employer, or (ii) (where the care or service was provided in a hospital, clin-

ic, or other facility) to the facility in which the care or service was provided if there is a contractual arrangement between such physician, dentist, or practitioner and such facility under which such facility submits the bill for such care or service; ...

42 U.S.C. § 1396a(a)(32) (emphasis added). We believe that this provision—subsection 32—does not require direct reimbursement to Danvers for the following reasons.

First, the language of subsection 32 does not say that the Commissioner must pay directly every person who provides a medical service. The provision is deliberately phrased in the negative. It says that the Commissioner *cannot* pay one who does *not* "provid[e] ... such care or service" absent special circumstances. The negative phrasing is important, for, from the perspective of ordinary English, many different persons or institutions might reasonably be considered as a "provider" of a given service. Suppose, for example, a nurse gives a pill ordered by a doctor to a patient located in the intensive care unit of a hospital. Who is the "provider"? The nurse? The doctor? The intensive care unit? The hospital? Depending upon the context in which one asks the question, one might consider any or all of them to "provide" the service. As far as ordinary English goes, the statute says, "Don't pay anyone who is not a provider"; it does not say, "When X, Y, and Z have all had a hand in supplying a service, choose (and pay directly) X as the provider."

Since a hospital in which a laboratory is located might be considered, along with the laboratory itself, to have provided a laboratory service, much of Danvers' argument— that *it* provided the service—is beside the point. The question here, in terms of the statute's language, is not what Danvers did but what the hospital did: Can the hospital be considered a provider? Here, where the *hospital* is required by state law to provide the services that Danvers (also) provides, *see* 105 C.M.R. § 130.200; 42 C.F.R. § 405.-1028, where the laboratory is physically inside the hospital, where the laboratory

treats hospital patients, and where the state recognizes the hospital as a provider of medical services by giving it a provider number, we see no reason not to consider the hospital an "institution ... providing ... service" within the terms of 42 U.S.C. § 1396a(a)(32).

Second, the statute's purpose strongly supports our reading of its language. The legislative history of the provision makes clear that it was aimed at stopping a practice under which

> some physicians and other persons providing services ... reassigned their medicare and medicaid receivables to other organizations or groups ... [which] purchased the receivables for a percentage of their face value, submitted claims and received payments in their name.

H.R.Rep. No. 393, 95th Cong., 1st Sess. 48, *reprinted in* 1977 U.S.Code Cong. & Ad. News 3039, 3051.

> Such reassignments have been a source of incorrect and inflated claims for services and have created administrative problems with respect to determinations of reasonable charges and recovery of overpayments. Fraudulent operations of collection agencies have been identified in medicaid. Substantial overpayments to many such organizations have been identified in the medicare program, one involving over a million dollars.

H.R.Rep. No. 231, 92d Cong. 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad. News 4989, 5090.

The purpose of the statute was to stop this "factoring" of Medicaid receivables— the selling of Medicaid obligations to collection agencies at a discount and the presentation of those obligations by the collection agencies to the state for payment. The statute stops this practice by *prohibiting* payment to those who are *not* providers. Given this "anti-factoring" purpose, there is no reason to interpret the statute as suggesting there can be only one provider for each service or as limiting the state's authority to choose *among bona fide medical providers* when designing its reimbursement scheme. To interpret the scope of the statute's word "providing" more narrowly (at least where collection-agency factoring is not an issue) would give the statute a meaning and effect well beyond what its drafters intended. Payment to a collection agency with no accountability for the nature and costs of the services rendered is quite different from payment to a hospital which is required to furnish the services and which has itself been determined to be eligible to participate as a provider in the Medicaid program. Indeed, the regulations that Health and Human Services has promulgated to implement § 1396a(a)(32) deal only with "reassignment" of provider claims to non-provider "factors" and collection agencies, but do not prohibit direct compensation to hospitals when hospitals are themselves *bona fide* providers of medical service. *See* 42 C.F.R. § 447.10.

Third, we find Danvers' strongest argument—based on exception (A)(ii) of subsection 32—plausible but insufficient to turn the tide. Danvers points out that the exception *allows* payment

> (ii) (where the care or service was provided in a hospital, clinic, or other facility) to the facility in which the care or service was provided if there is a contractual arrangement between such physician, dentist, or [individual] practitioner and such facility under which such facility submits the bill for such care or service....

What need would there be for the *exception,* Danvers asks, if the state could, even without the exception, consider the hospital (facility) to be a provider of services that a doctor (also) provides inside the hospital? That is to say, in Danvers' view, our interpretation of the statute makes the exception unnecessary, for the state could pay the hospital (despite the statute) without the exception.

The answer to this argument is twofold. For one thing, our reading of the statute does not render the exception meaningless. Suppose, for example, the state did *not* consider the hospital to be a provider of, say, a certain doctor's services (perhaps because the hospital was not obliged to

furnish such services as a condition of state licensure). The exception would allow the state *even then* to pay the hospital directly if the hospital and the doctor so contract and the hospital does the billing. That is to say, the exception would allow payment to a "non-providing" hospital, given an appropriate contract, without requiring the state to deem the hospital a "provider," a label that might carry with it other legal consequences under the "State plan," *see, e.g., Green v. Cashman*, 605 F.2d 945, 946 (6th Cir.1979) (whatever rights a nursing home has arise exclusively from a provider agreement).

For another thing, under Danvers' reading of the statute, the exception would produce a still more peculiar result. By refusing to enter into appropriate contracts, a hospital would be able to force a state to reimburse its staff separately and individually. This result would threaten the Medicaid statute's cost containment objectives, *see* H.R.Rep. No. 158 at 293, would unduly restrict the flexibility of states in fashioning reimbursement systems, *see id.; Michael Reese Physicians & Surgeons, S.C. v. Quern*, 606 F.2d at 735, and could create serious administrative problems. We believe our reading of the statute, which narrows the exception's scope, is more consistent with Congress's objectives than a reading of the statute that makes of it an instrument for achieving objectives that Congress did not intend.

Finally, our reading of the statute is consistent with the views of the Associate Regional Administrator of Health and Human Services as set forth in a letter to the district court. The letter would be more "persuasive," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) if it were less conclusory, if it reflected consultation with Health and Human Services' national offices, or if it described Health and Human Services practice in other regions. Still, we take it as offering some (though weak) support for our conclusion. *See Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982) (Supreme Court reliance on Health and Human Services amicus brief not submitted at trial). Because the parties apparently disagree about the letter's status, and for future guidance, we also call their attention to the Supreme Court's statement in *Rosado v. Wyman*, 397 U.S. 397, 406–07, 90 S.Ct. 1207, 1214–15, 25 L.Ed.2d 442 (1970):

> Whenever possible the district courts should obtain the views of [HHS] ... in those cases where it has not set forth its views either in a regulation or published opinion, or in cases where there is real doubt as to how the Department's standards apply to the particular state regulation or program.

With the letter or without, we believe that subsection 32 does not require the Commissioner to pay Danvers directly. Since other issues may remain for the district court to consider, its judgment is

*Reversed, and the case is remanded for further proceedings consistent with this opinion.*