Darlene SMITH, on behalf of herself and all others similarly situated, Plaintiff–Appellee,

v.

C. Patrick BABCOCK, Director of the Michigan Department of Social Services, Defendant–Appellant.

No. 92–2207.

United States Court of Appeals, Sixth Circuit.

Argued June 21, 1993.

Decided March 14, 1994.

Jacqueline Doig (argued and briefed), Legal Services of Eastern Michigan, Midland, MI, Terri L. Stangl, Legal Services of Eastern Michigan, Saginaw, MI, for plaintiff-appellee.

Frank J. Kelley, Thomas L. Casey, Office of Atty. Gen., Appellate Div., Erica Weiss

Marsden (argued and briefed), Lansing, MI, for defendant-appellant.

Before: KENNEDY and NORRIS, Circuit Judges; and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

This case is about one state's efforts to lead welfare recipients down the path to self-sufficiency. At issue is the proper implementation of the Earned Income Disregard ("EID"),[1] a provision of the Aid to Families with Dependent Children program ("AFDC"),[2] which encourages welfare recipients to seek gainful employment.

Defendant C. Patrick Babcock is the Director of the Michigan Department of Social Services ("MDSS"), the agency responsible for implementing Michigan's AFDC program. Plaintiff Darlene Smith is a recipient of AFDC in Michigan who recently quit her job at a nursing home "without cause." The term "without cause" indicates that Smith's unemployment is "voluntary"—she left her previous job without being fired and without complaining of mistreatment. Smith brings this class action on behalf of all Michigan AFDC recipients who, like her, voluntarily quit their jobs. She attacks the MDSS policy of refusing, for the month in which she quit, to augment her AFDC benefits with an EID work incentive bonus.

## I. AFDC, Welfare Dependency, and the Earned Income Disregard

AFDC provides financial assistance to needy children and their families. 42 U.S.C.

§ 601. State and federal agencies share responsibility for implementation of the AFDC program. States like Michigan wishing to participate in the AFDC program submit plans to the Department of Health and Human Services ("HHS") for approval. *Id.* § 602(b). A state-administered AFDC program must comply with federal law. *See King v. Smith,* 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141 n. 34, 20 L.Ed.2d 1118 (1968); *Boettger v. Bowen,* 923 F.2d 1183, 1185 (6th Cir.1991).

AFDC was established by the Social Security Act of 1935. *See* Title IV, § 401, 49 Stat. 620, 627–29 (1935). Although welfare programs such as AFDC were initially conceived as temporary relief measures, we have sadly come to recognize that some welfare recipients may never achieve self-sufficiency.[3] Yet the goal of self-sufficiency remains a powerful symbol in America. It has been said that "[t]he aim of any good antipoverty strategy should be to maximize the number of people who are self-sufficient. . . ." Edelman, *Toward a Comprehensive Antipoverty Strategy: Getting Beyond the Silver Bullet,* 81 GEO.L.J. 1697, 1733 (June 1993). The pressing need to alleviate the tragedy of "welfare dependency" has prompted legislatures throughout the country to experiment with a variety of reform initiatives.[4]

The battle against welfare dependency is often viewed in terms of setting the proper incentives.[5] This case involves one such work incentive: AFDC's Earned Income Dis-

---

1. 42 U.S.C. § 602(a)(8).

2. 42 U.S.C. §§ 601 *et seq.*

3. Even as he championed the relief programs of the New Deal, President Roosevelt expressed his fear that "continued dependence upon relief induces a spiritual and moral disintegration fundamentally destructive to the national fibre. To dole out relief in this way is to administer a narcotic, a subtle destroyer of the human spirit." (quoted in KATZ, IN THE SHADOW OF THE POORHOUSE: A SOCIAL HISTORY OF WELFARE IN AMERICA 226 (1986)). It is now estimated that "close to one-third of those coming on the rolls for the first time will be dependent on welfare for at least eight years." Reischauer, *Welfare Reform: Will Consensus Be Enough?,* BROOKINGS REV. 3 (Summer 1987).

4. *See* Taylor, *Welfare Reformers Seek to Modify Budgets and Behavior,* WASH. POST, Dec. 16, 1991, at A1 (describing recent AFDC innovations). Among the recent welfare reforms are: (1) Learnfare, which ties benefits to school attendance; (2) Family Cap, which links benefits to birth control; and (3) Bridefare, which provides incentives for marriage among parents. For a critical appraisal, *see* Williams, *The Ideology of Division: Behavior Modification Welfare Reform Proposals,* 102 YALE L.J. 719 (Dec.1992).

5. Incentives "make welfare less attractive by making work more appealing, i.e., by 'making work pay.'" Gueron, *Welfare and Poverty: The Elements of Reform,* 11 YALE L. & POL'Y REV. 113, 117 (1993). According to this theory, "work incentives may be increased by changes inside the welfare system, e.g., by reducing the extent to

regard. The EID encourages work by allowing welfare recipients to retain a portion of their earnings without risking disqualification from AFDC. 42 U.S.C. § 602(a)(8)(A)(iv). Prior to the advent of the EID, a welfare recipient might have been deterred from working by the prospect of losing his or her welfare benefits. But the EID allows the MDSS to "disregard" a portion of the recipient's income in calculating the level of benefits. In effect, the EID provides bonus benefits to recipients who choose to work. The term "earned income disregard" signifies, in the parlance of the law of AFDC, the amount of earnings which are to be disregarded in calculating the benefits payable to a working welfare recipient.

## II. The Case of Darlene Smith

In enacting the EID, Congress expressed the hope that "this provision will furnish incentives for members of public assistance families to take employment and, in many cases, increase their earnings to the point where they become self-supporting." S.REP. No. 744, 90th Cong., 1st Sess. 158 (1967), reprinted in 1967 U.S.C.C.A.N. 2834, 2995. When Darlene Smith responded to this incentive by finding a job at a nursing home, the MDSS awarded her an EID bonus. Smith continued to claim and receive increased benefits as a result of the EID through December, 1988. But that is where her story departs from the Congressional vision. Although Smith temporarily "increase[d] [her] earnings," she never "bec[ame] self-supporting," because she voluntarily quit her job at the nursing home on January 24, 1989. We are unable to say why Smith no longer found the EID work incentive attractive, because her decision to cease working and return to welfare dependency is explained nowhere in her appellate brief.

The dispute giving rise to this appeal began when Smith informed the MDSS at the end of January, 1989, that she no longer planned to work at the nursing home. Because Smith had worked for part of January, she claimed a work incentive bonus from the MDSS, despite the fact that she had quit her job. The MDSS denied her the January EID, and refused to disregard her January earnings in calculating her benefits. The MDSS reduced her welfare payment to take into consideration her pre-termination January income. The MDSS informed Smith that it would not disregard income earned for any month in which a recipient voluntarily quits a job.[6]

Smith brought this action to challenge Michigan's refusal to grant her a work incentive bonus for the month in which she voluntarily quit her job. Smith concedes that the EID was designed to reward recipients who choose to work, but she argues that Congress never intended to punish recipients who choose not to work. In her view, the EID is a carrot, not a stick.[7] The district court agreed with Smith and struck down the regulation under which Smith was denied the EID for January. Because we believe that the MDSS has adopted a permissible interpretation of the EID which furthers the Congressional goal of encouraging employment, we reverse the judgment below and restore Michigan's policy of refusing to award the work incentive bonus to recipients who voluntarily quit their jobs.

## III. The Scope of Judicial Review of Administrative Regulations

 To begin our analysis, we must frankly acknowledge what should be obvious: courts are not administrative agencies, and judges are not administrators. In the context of administrative law, the Supreme Court has admonished us to adhere to the

which the AFDC grant or other benefits tied to welfare (such as child care and Medicaid) are cut when people go to work." *Id.* at 118.

6. The MDSS Program Eligibility Manual provides that income will not be disregarded when "[a] person, without good cause during the income month, terminates his employment, reduces his earned income, or refuses to accept a bona fide offer of employment...." *Id.* at 18.

7. Although not a party to this dispute, the Regional Administrator of HHS has apparently taken the position that the EID denials do in fact embody an "intent to penalize" voluntary quitters. *See* Letter from Marion N. Steffy, Regional Administrator of HHS, to C. Patrick Babcock, Director of MDSS (Sept. 25, 1989).

"venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong...." *Red Lion Broadcasting Co., Inc. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). We must defer to the MDSS' interpretation of the EID as long as it is permissible, regardless of any inclination we may harbor to construe the EID in a contrary fashion. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 104 S.Ct. at 2782. A plaintiff such as Smith seeking to impose a particular statutory construction upon an agency carries the heavy burden of showing that the interpretation embraced by the agency clearly contradicts the will of the legislature. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 292, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988) ("If the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute.").

## IV. The Proper Interpretation of the EID

Congress authorized the EID work incentive bonus by instructing AFDC administrators to disregard approximately one-third of a recipient's income in calculating the level of benefits.[8] In addition to the general provision authorizing the EID, Congress established several specific "EID denials" to prevent recipients from claiming the work incentive bonus. For example, the EID is not available in any month where the recipient has "terminated his employment or reduced his earned income without good cause within such period ... preceding such month as may be prescribed by the Secretary...."[9]

42 U.S.C. § 602(a)(8)(B)(i)(I). The EID is also denied if a recipient "refused without good cause within such period preceding such month as may be prescribed by the Secretary, to accept employment in which he is able to engage...." *Id.* § 602(a)(8)(B)(i)(II).

In this suit, Smith challenges Michigan's policy of refusing to award the EID work incentive bonus for the month in which she quit. She argues that section 602(a)(8)(A) requires the MDSS to presumptively disregard a portion of her income. She construes the EID denials in section 602(a)(8)(B) as permitting the agency to respond to her quitting in only one way: by using her income for the month *following* the month in which she quit to reduce her benefits for that month. In other words, Smith claims that her February income, if she had any, could be included to reduce her February benefits, but her pre-termination January income can not be included to reduce her January benefits.

Smith argues that the following "plain language" of the statute ineluctably leads to her construction of the EID denials:

A State plan for aid and services to needy families with children must provide that (with respect to any month) the State agency shall not disregard, under clause (ii), (iii), or (iv) of subparagraph (A), any earned income of any one of the persons specified in subparagraph (A)(ii) if such person terminated his employment or reduced his earned income without good cause within such period (of not less than thirty days) preceding such month as may be prescribed by the Secretary....

42 U.S.C. § 602(a)(8)(B)(i)(I).

Smith concedes that this language permits the MDSS to deny the EID in certain circumstances, but she argues that the agency's decision to deny her the EID *for the month in which she quit* is not one of those circumstances. Smith focuses on the language in

---

8. "[T]he State agency shall disregard from the earned income of any [AFDC recipient] ... an amount equal to (I) the first $30 of the total of such earned income not disregarded under any other clause of this subparagraph plus (II) one-third of the remainder thereof...." 42 U.S.C. § 602(a)(8)(A)(iv).

9. The Secretary set the applicable period for denying the EID at the statutory minimum of 30 days. 45 C.F.R. § 233.20(a)(11)(iii)(A)–(B) (1992).

section 602(a)(8)(B)(i)(I) which she claims defines the only type of voluntary "termination] [of] employment" justifying denial of the EID. Smith argues that the EID can only be denied in a given month if the recipient quits her job "within [the] [thirty day] period *preceding*" the month in which the EID is to be denied. In other words, Smith construes 602(a)(8)(B)(i)(I) as authorizing the denial of her EID in January only if she had quit her job in December.

In contrast, the MDSS reads 602(a)(8)(A) and (B) as establishing an incentive system which encourages employment by rewarding recipients who work. The agency would allow Smith to profit from the EID while she remains employed, but it would deny her the EID for the month in which she voluntarily quit her job. The agency argues that the promotion of employment which is the EID's objective will be frustrated by rewarding individuals like Smith who quit a decent job without cause. A January EID denial would prevent Smith from claiming the work bonus after voluntarily terminating her employment.

Smith cites no legislative history indicating that Congress wanted recipients who choose not to work to benefit from the EID. She does, however, offer a non-punitive justification for the existence of the EID denials. Smith argues that Congress wanted to prevent AFDC applicants from temporarily reducing their income to qualify for benefits, then immediately augmenting their income to profit from the EID.

Smith points to the following extract from the legislative history to bolster her argument:

> In order to avoid situations where people under the AFDC program would deliberately bring their earnings down in order to qualify for the earnings exemptions, the committee bill provides that individuals who deliberately reduce their earned income or terminate their employment within a period of not less than thirty days specified by the Secretary before applying for aid will not qualify for the earnings exemption.

S.REP. No. 744, *supra*, at 2996.

Smith is correct that *one* purpose of the EID denials was to thwart abusive techniques employed by applicants seeking to qualify for AFDC and profit from the EID. However, it is an entirely different matter for her to assert that the type of behavior she describes is the *only* behavior Congress hoped to impact in implementing the EID and EID denials.

The consistent Congressional intent embodied in the EID provisions is a desire to encourage employment and eventual self-sufficiency on the part of AFDC recipients. As we noted above, Congress "believe[d] that this provision [would] furnish incentives for members of public assistance families *to take employment and, in many cases, increase their earnings to the point where they become self-supporting.*" S.REP. No. 744, at 2995 (emphasis added). The legislative history for the EID is replete with further discussion of the incentives Congress hoped would encourage recipients to work:

> A key element in any program for work and training for assistance recipients is an incentive for people to take employment. If all the earnings of a needy person are deducted from his assistance payment, he has no gain for his effort.... There is no doubt, in the opinion of the committee, that the number of recipients who seek and obtain employment will be greatly increased if, in conjunction with the work incentive program, there may be added to title IV some specific earnings incentives for adults to work. The Department of Health, Education and Welfare has informed the committee that research and demonstration projects have illustrated that more recipients will go to work when an incentive exists....
>
> [T]he principle has been well recognized that an economic incentive for employment is essential in work programs....

*Id.* at 2994–95.

These passages express what we understand to be the unequivocal intent of Congress to encourage employment among welfare recipients, with the ultimate aim of removing these individuals from the welfare rolls. *Cf. Shea v. Vialpando*, 416 U.S. 251, 264, 94 S.Ct. 1746, 1755, 40 L.Ed.2d 120

(1974) (finding Congressional intent in other AFDC provisions "to encourage AFDC recipients to secure and retain employment"). What Congress wanted was for recipients to *find and keep jobs*, and we find no support for the notion that recipients who discard work opportunities must be rewarded. *See Boettger*, 923 F.2d at 1187 ("the ability of a recipient to terminate employment at his or her election is totally inconsistent with the aims of Congress").

■ We reject Smith's contention that the terms of section 602(a)(8)(B) are so clear and unambiguous that we must embrace the interpretation she promotes. As we noted in another context, the language of 602(a)(8)(B) "is not the easiest to understand." *Boettger*, 923 F.2d at 1187. In such a situation, when the disputed provision permits a range of interpretations, a presumption arises in favor of the agency's construction of the statute it must implement. *See K Mart*, 486 U.S. at 292, 108 S.Ct. at 1818; *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–83; *Red Lion*, 395 U.S. at 381, 89 S.Ct. at 1802; *Boettger*, 923 F.2d at 1186. The MDSS' implementation of the EID is permissible because it promotes Congress' primary goal of encouraging employment among welfare recipients. *See* S.REP. No. 744, *supra.*

■ Our decision to defer to the MDSS' construction of the EID is bolstered by our conclusion that the alternative construction offered by Smith would render portions of the statutory text meaningless as applied to the AFDC recipients in her factual circumstances. We are mindful of the principle that interpretations which yield internal inconsistencies or render some portion of the text superfluous are to be avoided. *See Lake Cumberland Trust, Inc. v. EPA*, 954 F.2d 1218, 1222 (6th Cir.1992) ("[W]e must … giv[e] effect to each word and mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citing *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir.1991)).

Smith's interpretation would permit the MDSS to deny the EID for the month *following* the month in which she quit. Since Smith quit in January, under this scenario she would be awarded the EID for January but denied the EID for February. But Smith did not work in February, and her method of applying the EID would render the EID denials ineffective as applied to her and many of the members of her class, since they are unemployed during the month following the voluntary termination of their employment.[10]

Smith's interpretation would serve, oddly enough, to reward members of the plaintiff class for working even after they quit their jobs. The MDSS argues that an interpretation which rewards Smith for working despite the fact that she quit is precisely the type of absurdity to be avoided in the construction of statutes. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available"). *Accord United States v. American Trucking Ass'ns*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). Why, the MDSS asks, would Congress reward Smith for quitting her job without cause? And why would Congress deny Smith the EID in February rather than January, when she is unlikely to have any February income? Worst of all, Smith would apply the EID denial in a way that might deter her from seeking new employment in February since the MDSS would have to include any February income in calculating her benefits.

The following hypothetical illustrates the futility of Smith's application of the EID. Let us assume that Smith earned $300 in January before she quit her job at the nursing home, and that she earned nothing in February since she refused to work. Under her approach, she would receive the EID bonus in January despite voluntarily quitting her job. Under the EID formula, *supra* note

---

10. The Regional Administrator of HHS has expressed concern that Smith's construction of the EID would "defeat the intent to penalize … since it is improbable that earned income would be present [in the month after quitting]." *See* Letter from Steffy to Babcock, *supra* note 7.

8, approximately one-third of her $300 January income would be disregarded by the MDSS. As a result, Smith would retain $100 of her earnings, in addition to her AFDC benefits. Smith would then include all of her February income in calculating her benefits. However, as long as she earns no income in February, the EID denial would not reduce her benefits.

By varying the hypothetical slightly, we can see the dangerous disincentive to employment Smith's approach might create. Assume that instead of remaining unemployed, Smith sought and found a new job beginning February 1. At the same rate of wages for a complete month, Smith would make $400 in February. Smith would preserve the January EID, which is worth $100, but would deny the February EID, which would cost her one-third of $400, or $133. She would lose money because she wanted to work! Such an implementation of the EID would have the effect of penalizing *only the voluntary quitter who wants to return to work.* One can hardly imagine a more untenable result in light of the overwhelming Congressional desire to encourage welfare recipients to work towards self-sufficiency.

In response to the argument that her interpretation of the EID is "absurd," Smith explains that her construction of the EID makes sense when applied to AFDC applicants, even if it is unreasonable as applied to AFDC recipients. She points out that the EID denial she advocates would prevent an individual applying for AFDC from temporarily reducing her income to qualify for aid, and later returning to work to profit from the EID. Although we recognize that Smith's interpretation might prevent some manipulation by AFDC applicants, we reject her overall approach because it would render the EID denial largely meaningless and often

counterproductive as applied to the AFDC recipients in her class.[11] Her argument might be persuasive if the EID denial was only supposed to apply to AFDC applicants, as the district court seemed to believe, since her construction prevents applicants from manipulating the system. However, Congress clearly indicated in 42 U.S.C. § 602(a)(8)(A)(ii) that the EID denials apply to *both* AFDC applicants and recipients.[12]

As we explained earlier, Congress sought, in enacting the EID, to encourage employment by allowing recipients to retain a portion of their income without risking the loss of benefits. Congress also limited the availability of the EID for recipients who refuse to take available employment or voluntarily quit jobs they already have. Congress expressly applied these EID denials to "any child or relative *applying for or receiving* aid to families with dependant children...." *Id.* § 602(a)(8)(A)(ii) (emphasis added). The MDSS argues, and we agree, that its interpretation of the EID denials is at least as permissible a construction of the law as Smith's because, unlike Smith, the agency has created an incentive for employment for applicants *and* recipients, as Congress expressly provided. We simply can not conclude that Smith's interpretation is the only proper construction of the statute, since it does nothing to encourage employment among AFDC recipients, and might well have deterred her from seeking a new job in February.

We recognize that in choosing between the alternative statutory interpretations of the EID denial offered by the parties, it may not be possible to select a single construction which applies to both applicants and recipients with complete effectiveness. Smith's proposal, as we have already detailed, is totally ineffective as applied to most recipients,

11. The district court acknowledged that Smith's interpretation "[a]dmittedly ... would seem to lead to a strange result" when "appl[ied] ... to the AFDC recipient who quits her job...." *Smith v. Babcock,* No. 89–CV–73752–DT, slip op. at 10 (E.D.Mich. Aug. 25, 1992) (Opinion and Order).

12. The district court recognized that the EID denials were "addressed to two distinct types of

persons. It targets the AFDC applicant who purposely reduces her earned income so as to qualify for the [EID]. It also addresses the current AFDC recipient who terminates her employment without cause." *Smith v. Babcock, supra* note 11, at 264. However, it apparently was not as concerned as we are that Smith's interpretation would render the EID denial largely ineffective as applied to a substantial portion of the individuals whose behavior Congress expressly sought to impact.

although it does deter some abuse on the part of new welfare applicants. In contrast, the state's interpretation provides an effective employment incentive for recipients, but it fails to impact applicants with full force. So we must choose between two imperfect alternatives, neither of which can claim to be the single ineluctable result intended by Congress. In such a case, we must defer to the agency, because Smith has not carried her heavy burden of demonstrating the impermissibility of the agency's construction of the statute. When presented with two plausible interpretations, we may not usurp the agency's legitimate policy-making function.

In this case, Smith represents at best the interests of herself and other welfare recipients in identical circumstances.[13] But AFDC is a program with wide-ranging social, political, and economic impact, and the agency is in a much better position to reconcile the competing policy interests involved. After all, "[t]he principle of deference to agency interpretation of statutes is rooted in the notion that the agency in its policy-making capacity is better able than the courts to balance the various competing interests...." *Office of Workers Compensation v. General Dynamics Corp.*, 980 F.2d 74, 79 (1st Cir. 1992).

The MDSS regulation challenged by Smith represents one state agency's careful balancing of competing and conflicting policy interests.[14] Government's desire to encourage capable individuals to work often contradicts its commitment to easing conditions of poverty, and budgetary constraints further complicate matters.[15] As one commentator notes:

> Resources are finite. Neither the state nor private charity can distribute them in unlimited quantities to all who might claim need. On what principles, then, should assistance be based? Who should—and, the more difficult question, who should not—receive help? Answering the questions means drawing lines, separating individuals into categories, and defending arbitrary distinctions....

KATZ, THE UNDESERVING POOR: FROM THE WAR ON POVERTY TO THE WAR ON WELFARE 9 (1989).

The MDSS has struck one of many permissible balances between paying welfare and encouraging work, and this court can not impose Smith's preference, or our own, on the agency. It is "the agency's province to strike a reasonable balance between competing statutory policies." *International Bhd. of Teamsters v. ICC*, 801 F.2d 1423, 1430

---

13. Smith's class may have been certified too broadly, because it includes individuals who would be hurt by her construction of the law. As we explained above, some voluntary quitters will lose money under Smith's construction of the EID, and that prompts us to question whether she can "fairly and adequately protect the interests of the class" as required by Fed.R.Civ.P. 23(a)(4). No class should be certified where the interests of the members are antagonistic, because the preclusive effect of the verdict may deprive unnamed class members of their right to be heard. As the Supreme Court noted in *Hansberry v. Lee*, 311 U.S. 32, 45, 61 S.Ct. 115, 119–20, 85 L.Ed. 22 (1940), "[s]uch a selection of representatives for purposes of litigation, whose substantial interests are not necessarily or even probably the same as those who they are deemed to represent, does not afford that protection to absent parties that due process requires." Only through diligent application of the class certification requirements in Fed.R.Civ.P. 23 can a district court ensure that the interests of individual class members will not be sacrificed by the named plaintiff. *See* Bell, *Serving Two Masters: Integration Ideals and Client Interests in School Desegregation Litigation*, 85 Yale L.J. 470, 505–11 (Mar.1976); *and* Note, *Conflicts In Class Actions*

*and Protection of Absent Class Members*, 91 Yale L.J. 590, 591–603 (Jan.1982).

14. In structuring AFDC as a joint federal-state venture, Congress provided Michigan with the opportunity to tailor the program according to its own particular needs and wisdom. *Cf. Danvers Pathology Assoc., Inc. v. Atkins*, 757 F.2d 427, 428–29 (1st Cir.1985) (upholding one state's "innovative" implementation of Medicaid, noting that "joint federal-state program[s]" provide states with desirable "flexibility"). Both Congress and HHS remain free, of course, to overrule decisions made by the MDSS pursuant to federal funding. In this case, however, there is no such suggestion of federal disapproval. On the contrary, *see* notes 7 and 10, *supra*.

15. *See, e.g., Welfare and Poverty, supra* note 5, 11 Yale L. & Pol'y Rev. at 114 ("[T]he more seriously we take the anti-poverty goal and consequently make programs more generous, the more we risk undermining self-reliance and decreasing the incentive for welfare recipients to take low-paying jobs."); Handler and Hasenfeld, The Moral Construction of Poverty: Welfare Reform in America 37 (1991) ("The relief of misery is contradicted by the need to uphold the work ethic.").

(D.C.Cir.1986). To the extent that the conflicting goals of welfare policy require compromises or trade-offs, the balancing of the relevant interests is quintessentially a political question most appropriately resolved by the elected branches of government. As the Supreme Court explained recently in *Pauley v. Bethenergy Mines, Inc.*, 501 U.S. 680, ——, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991), deference to an agency's interpretation of ambiguous statutes "reflects a sensitivity to the proper roles of the political and judicial branches" in situations where "the resolution of ambiguity in a statutory text is ... more a question of policy than of law." Within this framework, we seriously doubt that *ad hoc* decisions resulting from federal litigation can rival the wisdom or the legitimacy of the choices made by welfare experts in the Executive branch of the government. As Justice Stevens observed in *Chevron:*

> [F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our Constitution vests such responsibilities in the political branches.' *TVA v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

*Chevron*, 467 U.S. at 866, 104 S.Ct. at 2793.

## V. Conclusion

We conclude that the MDSS has adopted a permissible interpretation of the EID which encourages recipients to take work and gives meaning to the EID denials as applied to all

of the people whose behavior Congress sought to impact. We find no "compelling indications" that the agency's interpretation of the statute is "wrong." *Red Lion*, 395 U.S. at 381, 89 S.Ct. at 1802. Accordingly, we decline to interfere with Michigan's administration of the AFDC program, since that is a job most appropriately, and in all likelihood most ably, performed by the MDSS and not the federal courts.

For the foregoing reasons, the judgment below is REVERSED.

KENNEDY, Circuit Judge, dissenting.

Because I believe the District Court's interpretation of the Earned Income Disregard ("EID") provision of the Aid to Families with Dependent Children ("AFDC") program was the correct one, I respectfully dissent.

The panel begins its analysis with the principle that the courts should defer to the administrative agency charged with the interpretation of the statute and must therefore defer to the Michigan Department of Social Services' ("MDSS") interpretation. If the interpretation were that of the Department of Health and Human Services ("HHS"), I would agree that deference is required. But Michigan is only one of 50 states. If some states construe the statute one way and others construe it another, deferring courts would reach opposite results as to the meaning of the statutory language. I do not believe the principle of deference to an agency has any application where 50 different state agencies would have to be deferred to.[1]

---

1. MDSS contends that the District Court erred by not giving sufficient deference to the Secretary's interpretation of § 602(a)(8)(B)(i)(I). In response to a letter from the MDSS seeking clarification of its regulations implementing the EID disqualification provision, the HHS stated:

> We have consulted with policy staff in our Central Office who fully concur that the regulation is ambiguous and open to interpretation. The language of the regulation mirrors that of the statute. While it predates the introduction of prospective/retrospective budgeting, no issues have surfaced concerning its application.... It would, however, defeat the intent to penalize to apply the penalty to the month after the job-quit month, when it is improbable that earned income would be present.

> Our Central Office concurs with our opinion that Michigan's application of the regulation is consistent with the AFDC budgeting requirements at 45 C.F.R. 233.31(b)(2).... In practice 45 C.F.R. 233.20(a)(11)(iii)(A) has been supplanted by more precise regulations, such as 45 C.F.R. 233.31(b)(2). Michigan's current practice of withholding deductions and disregards in the budget/job-quit month is acceptable.

Even assuming, arguendo, that this letter constitutes an agency interpretation, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (quoting *Board of Gover-*

I believe that the plain language of the statute requires us to affirm the District Court.

For the MDSS Deduction Policy to be valid, it must be consistent with the "disregard sanctions" of the Social Security Act, 42 U.S.C. § 602(a)(8)(B)(i). To the extent it is inconsistent with the controlling statute, it is invalid. *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). In deciding whether the state policy is consistent with the federal statute, we look first to the statutory language in an effort to determine its plain meaning. *Patterson Trust v. United States*, 729 F.2d 1089, 1094 (6th Cir.1984). "Except in 'rare and exceptional circumstances,' such as where Congress 'expressly indicates' its intent that the plain language of the statutory language be avoided, unambiguous statutory language 'is to be regarded as conclusive.'" *Id.* at 1095 (citations omitted); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (citations omitted) (courts will only look to legislative intent "[w]here the plain language of the statute would lead to 'patently absurd consequences,' that 'Congress could not possibly have intended.'"), *id.* at 470, 109 S.Ct. at 2574 (Kennedy, J., concurring) (quoting *United States v. Brown*, 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948); *FBI v. Abramson*, 456 U.S. 615, 640, 102 S.Ct. 2054, 2069, 72 L.Ed.2d 376 (1982) (O'Connor, J., dissenting)); *Boettger v. Bowen*, 923 F.2d 1183, 1191 (6th Cir.1991) (Ryan, J., dissenting) ("Courts may not properly extend statutory language beyond its plain meaning in order to reach a result that is consistent with Congress' probable intention. Our business is to determine what

Congress said, not what it probably intended.").

Here, the statutory language at issue provides that "with respect to any month, the State agency shall not disregard ... any earned income of any one of the persons specified in subparagraph (A)(ii) if such person terminated his employment or reduced earned income without good cause within such period (of not less than thirty days) preceding such month...." 42 U.S.C. § 602(a)(8)(B)(i)(I). Similarly, the HHS regulations implementing the AFDC program provide that:

> (iii) The applicable earned income disregards ... do not apply to the earned income of the individual *for the month in which* one of the following conditions apply to him:
>
> > (A) An individual terminated his employment or reduced his earned income without good cause (as specified in the State plan) *within the period of 30 days preceding such month....*

45 C.F.R. § 233.20(a)(11)(iii) (emphasis added). I agree with the District Court that the phrase "any month" in section 602(a)(8)(B)(i)(I) refers to the month in which the recipient earned income and that the subsequent use of the phrase "such month" clearly refers back to and is synonymous with "any month."[2] Thus, as applied to the specific facts of this case, the federal statute instructs that:

> With respect to January (plaintiff's income earning month), the MDSS shall not disregard the earned income of Ms. Smith if she terminated her employment within 30 days prior to January (i.e., in December).

---

nors, FRS v. Dimension Financial Corp., 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986)). Furthermore,

> The interpretation put on the statute by the agency charged with administering it is entitled to deference, but the courts are the final authorities on issues of statutory construction. They must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.

Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981) (citations omitted). It seems that the agency's position (as set forth in a letter and not by adjudication or rulemaking) is inconsistent with the statutory mandate (and its implementing regulations) that the EID penalty only applies to income earned in the month following the job-quit month.

2. The District Court relied on the dictionary definition to support its interpretation that the adjective "such" as used in § 602(a)(8)(B)(i)(I) refers to something previously indicated. The dictionary is one of the most legitimate sources available for determining what the statutory language means. *Boettger*, 923 F.2d at 1189 (Ryan, J., dissenting).

In other words, the State agency may not disregard the income earned during the month *following* the month a recipient terminates her employment without cause. Here, because Smith terminated her employment in January, the federal statute seems to direct the MDSS to deny her the benefit of the disregards as to any income earned by her *in February*.

Consequently, the unambiguous statutory language, read in its common and generally understood sense, rather plainly does not authorize the MDSS to deny Smith the benefit of EIDs for income earned in January (the job-quit month), and the MDSS does not seem to claim that a literal straightforward reading of the statutory language, unaided by interpretation, warrants any other conclusion. The MDSS instead argues that common sense suggests that Congress must have intended to permit state agencies to disallow EIDs in the month a recipient terminates her employment without cause, given its overall purpose in enacting the legislation. Specifically, the MDSS argues that a literal interpretation of the EID penalty provision and implementing regulation renders them almost meaningless as applied to AFDC applicants or recipients who *terminate employment* because if (as happened here) an applicant quits her job in January, she is unlikely to have any earned income in February which would be subject to the EID penalty. While common sense might support this argument, the Supreme Court has said that:

> Judicial perception that a particular result would be unreasonable may enter into the construction of ambiguous provisions, but cannot justify disregard of what Congress has plainly and intentionally provided.

*Commissioner of Internal Revenue v. Asphalt Prods. Co.*, 482 U.S. 117, 121, 107 S.Ct. 2275, 2278, 96 L.Ed.2d 97 (1987). While it might have been sensible for Congress to authorize states to disallow EIDs for the month in which a recipient terminated her employment, it did not do so.

Additionally, this is not one of those rare and exceptional circumstances where applying the plain language of the statute would lead to "patently absurd consequences that 'Congress could not have possibly intended.'"

As the District Court pointed out and the panel acknowledges, section 602(a)(8)(B)(i)(I) is addressed to two distinct groups: the AFDC applicant who purposely reduces her earned income in order to qualify for the EIDs and the current AFDC recipient who terminates her employment without cause. While applying the plain language of the statute to AFDC recipients might lead to a strange result (because it is unlikely a recipient who quit her job in Month A will have income in Month B to which the EIDs can be applied), the District Court reasoned that

> [t]he purpose of the statute becomes more clear when applied to the AFDC *applicant* who reduces her income to qualify for AFDC benefits. The provisions, as construed by the Court, puts this applicant on notice that she will not benefit from the earned income disregards in the month following her calculated reduction of income.

Moreover, Smith offered a very plausible reason why Congress meant what it said in section 602(a)(8)(B)(i)(I):

> Congress sought methods of ensuring that the disregards would "get people off the AFDC rolls, not put them on," by ensuring that only those already receiving or eligible to receive AFDC would qualify for the disregards. Two alternative qualifying tests were created as a result. The "30 and a third" disregards would be made available only to families (1) whose earnings were so low they would be eligible for AFDC even without application of the disregard or (2) who had received AFDC in one of the four prior months. 42 U.S.C. § 602(a)(8)(B)(ii)(I). Thus, a family could receive the benefit of the Earned Income Disregards either by passing the income test or by being "grandfathered."

> Congress also recognized the possibility that individuals who were not currently eligible for AFDC based on their gross earnings could make an "end run" around that qualifying test by temporarily reducing their earned income to a level that would make them AFDC eligible even without application of the disregards, enabling them to pass the income test. Then, once they had received AFDC for at

least a month, they could remain on AFDC in future months—even with higher earnings that would have disqualified them from receiving AFDC in the first instance—by qualifying for the Earned Income Disregards under the grandfather clause.

Smith contends that the EID penalty provision was directed toward closing this "loophole."

This contention is supported by the Legislative History which provides that

> [i]n order to avoid situations where people under the AFDC program would deliberately bring their earnings down in order to qualify for the earnings exemption, [the statute] provides that individuals who deliberately terminate their employment within a period of not less than 30 days specified by the Secretary before applying for aid will not qualify for the earnings exemption.

S.Rep. No. 744, 90th Cong., 1st Sess., reprinted in 1967 U.S.Code Cong. & Admin.News 2834 at 2996 (emphasis added). This Court has also stated that, with respect to section 602(a)(8)(B)(i), "[a]lthough the language is not the easiest to understand, when 'translated,' it simply means that you cannot quit a job or refuse a job to become eligible for benefits." Boettger, 923 F.2d at 1187 (emphasis added). Thus, there is support for the position that Congress intended to prevent those who deliberately reduce their income, in order to qualify for AFDC, from using the EIDs (which ordinarily would be available under the "grandfather clause") to stay on AFDC. The District Court's conclusion that the EID disqualification applies to an individual's earnings in the month following the month in which earnings were reduced (or terminated) is consistent with this Congressional purpose.[3] Accordingly, the result of applying the plain language of the statute is not "patently absurd."

The MDSS has proffered several alternative interpretations of the statute which it claims are consistent with Congressional in-

tent. These interpretations, however, also all seem to contravene the plain language of the statute.

First, the MDSS contends that the District Court erred in finding that the relevant statutory and regulatory language requires states to consider only employment terminations that occur within a 30–day period that begins and ends prior to the job-quit (or penalty/budget) month. The MDSS attempts instead, to expand the period represented by "such period (of not less than 30 days)" to reach into the job-quit month. Specifically, the MDSS claims that the statute can be read to mean that in order for a state agency to disallow EIDs for the month in which an individual quits her job, the employment termination must have occurred within a period that includes the job-quit month and extends 30 days before this month. However, as noted above, the statute in question expressly provides that, with respect to any month, a participating state shall not disregard an individual's earned income if that individual terminated her employment or reduced her income without good cause within such period (of not less than 30 days) preceding such month. § 602(a)(8)(B)(i)(I). As the District Court explained:

> "Period" normally refers to the beginning and end of an interval of time. "Preceding" normally refers to that which passes before. Within such period thus refers to a window of time stretching to, at one end, the beginning of a month (here, the earned income month) and stretching from, at the other end, thirty days before the beginning of the earned income month. This is the clear import of the language. Defendant's attempt to construe the language to include a portion of the earned income month lacks any support.

The MDSS further contends that the term "month" could refer to the month in which the state pays the AFDC grant to the recipient (what the MDSS refers to as the "payment month"). As applied to this case, the statute would instruct that

---

**3.** The MDSS contends that the District Court erred in finding that the EID disqualification provision only applied to applicants and not to recipients. This is not, however, what the court

found. The court merely recognized that the statutory language makes more sense when applied to applicants than to recipients.

with respect to March (the payment month), the MDSS shall apply the EID penalty if Ms. Smith terminated her employment within such period of not less than 30 days preceding March.

Because Smith quit her job in January, this interpretation might seem to support the MDSS' action of disallowing the EIDs. However, the MDSS' interpretation is problematic. First, MDSS' interpretation will produce results which vary from state to state depending on the state's choice of budgeting cycle, a situation Congress could not have intended.

Pursuant to 42 U.S.C. § 602(a)(13), a state may calculate AFDC in one of three ways. The three types of AFDC budgeting cycles are: (1) Prospective Budgeting—Month C's [*e.g.*, March] earned income is predicted to calculate Month C's AFDC grant; (2) One Month Retrospective Budgeting—Month B's [*e.g.*, February] earned income is used to calculate Month C's [March] AFDC grant; and (3) Two Month Retrospective Budgeting—Month A's [January] earned income is reported in Month B [February] and is used to calculate Month C's [March] AFDC grant.

Michigan uses Two Month Retrospective Budgeting.[4] However, for states that employ Prospective Budgeting, the MDSS' interpretation that "such month" refers to the "payment month" and not the "earned income month" runs into problems. Under prospective budgeting, the earned income month is the payment month. Thus, a jobquit which occurs during the earned income month (January in this case) cannot have occurred "within such period (of not less than thirty days) preceding" such payment month

(also January). This is just one of the many problems resulting from the MDSS' interpretation of the word "month" to mean "payment month." The MDSS even concedes that its interpretation leads to illogical and inconsistent results which could not have been intended by Congress. Additionally, as explained above, and as found by the District Court, "[t]he clear, and only possible, referent for 'any month' is the earned income month." Consequently, MDSS's policy of disallowing EIDs in the same month (and not the following month) during which an AFDC recipient terminates her employment without cause, contravenes the Social Security Act, 42 U.S.C. § 602(a)(8)(B)(i)(I).

I would **AFFIRM** the judgment of the District Court.

---

**4.** The MDSS contends that for states like Michigan which adopt a two-month retrospective budgeting system, Congress and the HHS have prescribed a period of 60 days preceding the payment month within which employment terminations are to be subject to the EID penalty. Thus, because Smith terminated her employment in January (60 days preceding the March payment month), the EID penalty provision applies. The MDSS claims that the 1982 regulations, allowing states to adopt prospective or retrospective budgeting, supports its position. The MDSS further claims that this interpretation is entirely consistent with § 602(a)(8)(B)(i)(I) which allows HHS to adopt a penalty period of "not less than" 30 days. However, pursuant to 45 C.F.R. § 233.20(a)(11)(iii)(A) it is clear HHS has

adopted a 30 day limit. This regulation provides that a state agency shall not apply EIDs to the earned income of an individual for the month in which

[a]n individual terminated his employment or reduced his earned income without good cause ... *within the period of 30 days* preceding such month.

The MDSS' contention that the 1982 regulations supplant § 233.20 because that section has remained virtually unchanged since 1969 is without merit. To this day, § 233.20(a)(11)(iii)(A), imposing a 30 day limit, has not been amended by HHS.