## In re EAST BOSTON NEIGHBOR-HOOD HEALTH CENTER COR-PORATION, Debtor.

### Official Unsecured Creditors' Committee, Plaintiff,

v.

Chittenden Trust Company, as Indenture Trustee, Van Kampen Intermediate Term Municipal Income Fund, Van Kampen High Yield Municipal Bond Fund, Scudder Massachusetts Tax Free Fund, Scudder Massachusetts Limited Term Tax Free Fund, and Medford Savings Bank, Defendant.

Bankruptcy No. 99–10576–CJK. Adversary No. 99–1212.

United States Bankruptcy Court, D. Massachusetts.

Dec. 30, 1999.

564

Andrew Z. Schwartz, Boston, MA, for committee.

John J. Monaghan, Boston, MA, Douglas L. Furth, New York City, for trustee and bondholders.

Kevin J. Simard, Boston, MA, for Medford Savings Bank.

M. Ellen Carpenter, Janet E. Bostwick, Boston, MA, for debtor.

### MEMORANDUM OF DECISION

CAROL J. KENNER, Bankruptcy Judge.

By its complaint in this adversary proceeding, the Official Unsecured Creditors' Committee in this case seeks a determination that certain liens that the Defendants assert against the Debtor's accounts receivable and real estate are invalid and unperfected. After a trial on the merits, at which few (if any) facts were truly in dispute, the Court now enters the following findings and rulings and, on the basis thereof, will dismiss the complaint on its merits.

### BACKGROUND AND PROCEDURAL HISTORY

The Debtor, East Boston Neighborhood Health Center Corporation, filed a petition for relief under Chapter 11 of the Bankruptcy Code on January 26, 1999, and has continued to conduct its business—the provision of health services to residents of East Boston—as a debtor-in-possession under §§ 1107 and 1108 of the Code. The Debtor's assets include real estate and claims for reimbursement from three categories of "health care insurers" for goods sold and services rendered to its patients. The three categories of insurers, and the claims against them, are (i) Medicare and Medicaid ("Federal Insurance Claims"), (ii) the Commonwealth of Massachusetts' so-called Uncompensated Care Pool ("State Insurance Claims"), and (iii) nongovernmental health insurers such as Blue Cross Blue Shield (collectively, "Private Insurance Claims").[1] These three categories of claims shall collectively be referred to as the "Health Insurance Claims." Defendant Medford Savings Bank ("Medford") asserts a claim against the Debtor in the approximate amount of $631,000 and contends that its claim is secured by a security interest in the Health Insurance Claims. The remaining five defendants (collectively, the "Bondholder Defendants") collectively assert a claim against the Debtor in the approximate amount of $8,930,000 and contend that their claim is secured by a security interest in the Health Insurance Claims and a mortgage on the Debtor's real estate.[2]

The Plaintiff is the Official Unsecured Creditors' Committee (the "Committee") in this Chapter 11 case, appointed pursuant to 11 U.S.C. § 1102(a)(1) by the United States Trustee on February 4, 1999. In bringing this action, the Committee purports to be acting pursuant to authority granted in paragraph 15 of the "Amended Stipulation and Order Pursuant to Sections 361 and 363 of the Bankruptcy Code and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure Concerning Use of Cash Collateral," which the Court approved on an interim basis on February 26, 1999, and approved on a final basis by the Final Order entered on March 22,

---

1. One of the legal issues in this proceeding is whether the Medicaid, Medicare, and Commonwealth Uncompensated Care Pool programs constitute "insurance" within the meaning of § 9–104(g) of the Uniform Commercial Code ("UCC") as adopted in Massachusetts, G.L. c. 106, § 9–104(g). I use the term "insurer" here only for convenience and make no implicit ruling that these programs are insurance within the meaning of the section.

2. Defendant Chittenden Trust Company is the Indenture Trustee under a Mortgage, Security and Loan and Trust Agreement of September 1, 1996 ("the Trust Indenture") among Chittenden, as indenture Trustee, the Debtor, and the Massachusetts Industrial Finance Agency ("MIFA"). Chittenden asserts this secured claim as Indenture Trustee on behalf of various bondholders, including the Scudder and Van Kampen Fund defendants (the "Funds"). The Funds assert the same secured claim in their capacity as owners of bonds issued pursuant to the Trust Indenture.

1999. The Amended Stipulation and Order was signed and agreed to by the Debtor, Medford, and the Bondholder Defendants. In relevant part, paragraph 15 of the Amended Stipulation and Order provides:

> 15. *Validity of Liens and Claims.* The liens and claims of the Senior Secured Creditors and Medford are hereby determined to be valid, enforceable and perfected as set forth in paragraphs C and D above subject only to ... (ii) the right of the Official Committee of Unsecured Creditors or any creditor to object to the validity, perfection or enforceability of the liens of the Senior Lender [i.e., the Bondholder Defendants] or Medford provided that any such objection is filed [on or before] May 7, 1999.

The Committee's complaint, filed May 7, 1999, challenges the validity of the Bondholder Defendants' mortgage and the validity, perfection, and enforceability of the security interests asserted by both defendants in the Health Insurance Claims. Medford and the Bondholder Defendants respond that their respective security interests and mortgage are valid, perfected, and enforceable against this bankruptcy estate. Medford has also (1) objected to the Committee's standing to bring this complaint and (2) counterclaimed for a determination that its claim is secured by properly perfected security interests in its collateral. At trial, Medford agreed that, because the Debtor is not a party to this proceeding, the Court should dismiss its counterclaim without prejudice to Medford's filing a proof of claim and seeking adjudication of that claim, if necessary, in another context.

The parties filed cross-motions for summary judgment, and, the material facts being few and uncontroverted, the Court might well have decided this adversary proceeding on those motions. However,

for lack of sufficient time between the briefing of the motions and the trial date, the Court allowed the matter to go to trial and denied the motions for summary judgment as moot. Nonetheless, the parties' summary judgment briefs, as supplemented by their oral arguments at trial, will serve as their arguments on the merits of the adversary proceeding.

## FINDINGS AND RULINGS

### 1. Standing of the Committee

■ The Court must first address the Committee's standing to bring this complaint. Medford contends that the Committee lacks standing because the Committee is not the estate representative and therefore can bring an action on behalf of the estate only with prior court authority. The Committee states that the necessary authority was granted by the Court in paragraph 15 of the "Amended Stipulation and Order" set forth above. Medford responds that this paragraph did nothing more than specify the time within which the Committee could object to the Defendants' liens; it did not supply, or obviate the need to obtain, Court authority to bring its objection.

The Court agrees with the Committee that paragraph 15 did more than establish a deadline. It also provided that absent a timely objection, the Defendants' liens would be deemed established for all purposes in this bankruptcy case. This would effectively foreclose the rights of the Committee and of unsecured creditors to object to the treatment of the Defendants' claims as secured in a plan of reorganization filed after the deadline.[3] The Committee has standing, without leave of court, to object to confirmation of a plan of reorganization on behalf of the interests of general unsecured creditors. 11 U.S.C. §§ 1109(b) and 1128(b).[4] If the Debtor were to file a plan

---

**3.** It was clear upon entry of the Amended Stipulation and Order that the Debtor would be filing its plan of reorganization only after the deadline.

**4.** Section 1109(b) states that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise

of reorganization that proposed to treat the Defendants' security interests as valid, then, but for paragraph 15, the Committee would be fully in its rights to object to the plan on the basis that it gave undue priority to the Defendants claims, to the detriment of the claims of unsecured creditors. The present complaint does nothing but make this same objection, albeit outside the context of a plan of reorganization, while the objection can still be made. Due process required that the Committee be assured of the authority necessary to preserve these rights of objection. In approving the stipulation, the Court construed paragraph 15 accordingly. The Court would not otherwise have approved the stipulation. Therefore, I conclude that the Committee has standing to bring this complaint.

### 2. *Validity of the Bondholder Defendants' Mortgage*

In Count II of its Amended Complaint, the Committee contends that the Bondholder Defendants' mortgage on the Debtor's real estate is a nullity because, according to the Committee, the operative language in Trust Indenture purports to grant a mortgage to the Bondholder Defendants "to the maximum extent possible pursuant to the Uniform Commercial Code," Trust Indenture § 203(a), and this is no extent at all because rights in real estate cannot be obtained pursuant to the UCC. The Committee concedes that it was the intention of the parties to the Trust Indenture to give a mortgage; but the Committee contends that regardless of the parties' intent, the quoted phrase rendered the granting clause null and ineffective. The Bondholder Defendants respond that the Committee's interpretation reads the crucial language out of context, lifting it from one granting clause (a clause granting security interests under the UCC in personalty) and applying it to another (the clause granting a mortgage on real

estate). They also argue that the Committee's construction flies in the face of overwhelming evidence in the Trust Indenture and elsewhere that the parties intended to give, and believed they had given, the Bondholder Defendants a mortgage on the realty.

The operative language appears in § 203(a) of the Trust Indenture, which states as follows:

> Mortgaged Property. In order to secure the due payment of principal, interest and any premium of or on the Bonds, the payment of all other amounts due or which may become due hereunder, and the compliance by the [Debtor] and [MIFA] with their agreements contained in this Agreement, the [Debtor], as mortgagor, hereby grants, pledges, assigns and mortgages to the Trustee for the benefit of the Bondholders and [MIFA], WITH MORTGAGE COVENANTS, and hereby creates in the Trustee, for the benefit of the Bondholders and [MIFA], to the maximum extent possible pursuant to the UCC, a security interest in, all of the following properties and insurance, condemnation and other proceeds therefrom (the "Mortgaged Property"):
>
> (i) The land described in Schedule A, all appurtenant rights, easements and fixtures (as defined in Section 9–313 of the UCC) and all buildings, structures and improvements now or hereafter located thereon (including all non-trade fixtures) (the "Premises");
>
> (ii) All goods, equipment, machinery, tools, furniture and other tangible personal property owned by the [Debtor]....

The Court agrees with the Bondholder Defendants that the long sentence that constitutes this paragraph includes two distinct granting clauses, the first of which grants a mortgage (as to such of the listed collateral as constitutes realty) and the second of which grants a security interest

---

and may appear and be heard on any issue in a case under this chapter." Section 1128(b)

states that "[a] party in interest may object to confirmation of the plan."

pursuant to the UCC (as to such of the listed collateral as constitutes personalty covered by the UCC), such that the sentence is properly parsed as follows:

"the [Debtor], as mortgagor

 (a) hereby grants, pledges, assigns and mortgages to the Trustee for the benefit of the Bondholders and [MIFA], WITH MORTGAGE COVENANTS, and

 (b) hereby creates in the Trustee, for the benefit of the Bondholders and [MIFA], to the maximum extent possible pursuant to the UCC, a security interest in,

all of the following properties...."

By virtue of placement and syntax alone, one can only conclude that the phrase at issue, "to the maximum extent possible pursuant to the UCC," modifies the word "creates" in the second clause and has nothing to do with the first clause.

Content and reason also require the same conclusion. By operation of § 203(a), the parties to the Trust Indenture were, with one sentence, establishing liens on both realty and personalty. The former required the creation of a mortgage in conformity with Massachusetts mortgage statutes, and the latter required conformity with the UCC as adopted in Massachusetts. As the Committee points out, the UCC does not apply to security interests in realty. It makes no sense to apply the phrase at issue to the mortgage granting clause when (1) the language of § 203(a) plainly indicates an intent to grant both a mortgage and a security interest in personalty, (2) the UCC does not apply to mortgages, and (3) the UCC does apply to security interests in personalty. Moreover, the phrase in question makes no sense when applied to the grant of a mortgage. To what extent is it possible to grant a mortgage pursuant to the UCC? The question itself is unintelligible because the UCC does not apply to mortgages: it

does not permit them, but neither does it limit or prohibit them. It simply abstains. On the other hand, it makes perfect sense to construe the phrase as modifying only the creation of a security interest in the collateral to which the UCC does apply. I conclude that it does so and, accordingly, that there is no defect in the grant of the mortgage.

### 3. Creation of Security Interests in Health Insurance Claims

In Counts I and III of its complaint, the Committee seeks determinations that the security interests asserted by Medford and the Bondholder Defendants in the Debtor's Health Insurance Claims are not valid, perfected, or enforceable against the Debtor–in–Possession or its estate. These counts comprise three alleged infirmities in each defendant's security interest: (1) that the defendants' respective security agreements did not even purport to give them security interests in the Health Insurance Claims; (2) that any such grant was not properly perfected because the Health Insurance Claims are outside the scope of the UCC[5] and, therefore, that the Defendants' filing of financing statements was not effective perfection regarding these assets; and (3) that, by operation of federal anti-assignment statutes, the Defendants' security interests in the Federal Insurance Claims are invalid. In this section, I address only the first.

#### a. Bondholder Defendants

The Committee argues that though the parties to the Trust Indenture intended to create, and believed their language did create, a security interest in favor of the Bondholder Defendants in the Health Insurance Claims, the language they employed nonetheless failed to create such a security interest. It failed because, the Committee argues, the Trust Indenture purports to vest in the Bondholder Defen-

---

5. In accordance with the controlling security agreements, the parties agree that this matter is governed by the Massachusetts version of the UCC. All references to the UCC in this memorandum are to the UCC as adopted in the Commonwealth of Massachusetts.

dants a security interest in "accounts" and "accounts receivable"; both terms have the same meaning in the Trust Indenture as the term "account" has in the UCC, G.L. c. 106, § 9–106; claims under a policy of insurance are, by operation of § 9–104(g) of the UCC, excluded from the UCC's definition of account; and the Debtor's Health Insurance Claims are "claims under a policy of insurance" within the meaning of § 9–104(g).

■ In addressing this argument, the Court begins with the language of the Trust Indenture. The operative language appears in § 203(b):

> *Pledge of Receivables.* As additional security for its obligations hereunder … the [Debtor] pledges and grants to the Trustee for the benefit of the Bondholders and [MIFA] a lien upon and security interest in, to the maximum extent possible pursuant to the UCC, the Receivables. . . .

The Trust Indenture defines "Receivables" in § 102:

> "Receivables" means the right to payment for goods sold or leased or services rendered by the [Debtor], whether in the form of accounts, accounts receivables [sic], contract rights, chattel paper, instruments or otherwise.

Therefore, the key word in this grant is "receivables," not accounts or accounts receivable. And "receivable" is not defined by reference to the UCC. It includes all rights to payment for goods sold and services rendered, regardless of whether they constitute accounts (as defined in the UCC) or come within the scope of the UCC. Therefore, the word "receivables" in the Trust Indenture applies to and includes the Debtor's Health Insurance Claims.

■ The Pledge of Receivables gives the Bondholder Defendants "a lien upon and security interest in, to the maximum extent possible pursuant to the UCC, the Receivables." Does the phrase, "to the maximum extent possible pursuant to the UCC," exclude the Health Insurance Claims from the "Receivables" as to which the Bondholder Defendants' received a "lien and security interest"? For two reason, I conclude that it does not.

First, regardless of whether Article 9 of the UCC applies to a security interest in the Health Insurance Claims, the Bondholders received a lien on the Claims because the term lien is defined by the Trust Indenture to include liens of all kinds, regardless of whether they are governed by Article 9, and it makes no sense to apply the phrase "to the maximum extent possible pursuant to the UCC" to liens to which the UCC does not apply. In relevant part, the Trust Indenture defines lien as "any mortgage, pledge, security interest, lien, judgment lien, easement, or other encumbrance on title." Trust Indenture, § 102, at p. 6. The definition speaks of "*any* lien" and includes items to which Article 9 clearly does not apply: mortgages, judgment liens, and easements. From this definition, I conclude that the parties to the Trust Indenture did not intend, by the phrase "a lien upon and security interest in," to limit the security interest created by the pledge of receivables to collateral within the scope of Article 9. Nor does the phrase "to the maximum extent possible pursuant to the UCC" exclude security interest to which Article 9 does not apply. As I explained above with respect to mortgages, Article 9 does not permit security interests to which it does not apply, but neither does it restrict or prohibit them. It simply has nothing to say about them. Therefore, the language of the Trust Indenture is properly construed as granting a security interest in the Health Insurance Claims, even if such security interests are governed by Article 9 of the UCC.

Second, the phrase "to the maximum extent possible pursuant to the UCC" does not exclude the Health Insurance Claims from the pledged receivables because Article 9 of the UCC does apply to the Defendants' security interests in the Health Insurance Claims. As support for

this conclusion, I rely on and refer to the treatment of this issue in section 4 below.

#### b. Medford Savings Bank

In Count III of the complaint, the Committee contends that, though the Debtor and Medford intended to create, and believed their language did create, a security interest in favor of Medford in the Health Insurance Claims, the granting language in the Debtor's Loan and Security Agreement with Medford failed to create a security interest in the Health Insurance Claims because such claims, being outside the scope of Article 9, were not within the definition of "accounts receivable" as that term is used in Medford's security agreement. The Court rejects this argument on two grounds.

■ First, in the Debtor's Loan and Security Agreement with Medford, the term "account receivable" is not defined by reference to the UCC, and the Agreement gives no cause, express or implied, to read the UCC's exclusion of insurance claims into the Agreement's definition of "account receivable." The Agreement gives Medford a security interest in "all accounts receivable of the borrower, now existing or hereafter arising," and in "proceeds and products of all the foregoing." Loan and Security Agreement, ¶ 7.1(b) and (g). In its definition of "account receivable," the Agreement states: "'Account' and 'account receivable' include accounts receivable, notes, drafts, acceptances and other forms of obligation and receivables." Loan and Security Agreement, ¶ 1.3. This definition does not expressly exclude insurance claims of any kind. More importantly, it does not limit "accounts receivable" to accounts governed by the UCC.[6] I conclude that "accounts receivable," as used in the Debtor's Loan and Security

Agreement with Medford, includes the Health Insurance Claims.

Second, even if the term "accounts receivable" in the Agreement is limited to accounts to which the Article 9 of UCC does apply, the Debtor's Health Insurance Claims are not excluded from "accounts receivable" because security interests in the Claims are not excluded from the scope of Article 9. As support for this conclusion, I rely on and refer to the treatment of this issue in section 4 below.

For these reasons, the Court concludes that, by the language of the Loan and Security Agreement, the Debtor did grant to Medford a security interest in its Health Insurance Claims.

#### 4. *Perfection of Security Interests in Health Insurance Claims*

In Count I (as to the Bondholder Defendants) and Count III (as to Medford), the Committee seeks a determination that any security interest the Debtor granted to the Defendants in the Health Insurance Claims was not properly perfected and therefore is ineffective against the bankruptcy estate. The basis of this argument is the Committee's argument that the Health Insurance Claims are excluded from the scope of Article 9 of the UCC by § 9–104(g) and, therefore, that a security interest in such claims cannot be perfected by the filing of a financing statement in accordance with the requirements of the UCC for perfection of security interests in accounts. As both Defendants concede, they perfected their security interests only by filing financing statements in accordance with the UCC. Therefore, the Committee would conclude, their security interests are not validly perfected.

■ The Defendants contend that the Debtor's Health Insurance Claims are pro-

---

6. The Agreement does provide that "to the extent the parties hereto can elect the governing law, the Uniform Commercial Code of Massachusetts shall govern security interests provided for herein," Loan and Security Agreement, par. 7.2, but this is merely an election of which state's UCC shall govern; it does not extend the UCC to matters outside its scope or limit the security interests granted in the Agreement to those governed by the UCC.

ceeds of patient accounts, that their security interests extend both to the accounts and their proceeds, and that security interests in both the accounts and the proceeds thereof are governed by Articles 9 of the UCC and, even if these Claims are insurance claims within the meaning of § 9–104(g), are not excluded from its governance by § 9–104(g). The Defendants also contend that the Federal and State Insurance Claims—the Debtor's claims for reimbursement from Medicaid, Medicare, and the Commonwealth's Uncompensated Care Pool—are not "policies of insurance" within the meaning of § 9–104(g) because the patients pay no premium for the benefits provided under such programs.

The Court agrees with the Defendants' first argument. The Debtor's claims against its patients for services rendered and goods sold (the "patient accounts") are "accounts" within the meaning of § 9–106[7]; and the Debtor's claims against the Health Insurers for payment of such accounts are proceeds of the patient accounts within the meaning of § 9–306(1).[8] Both Medford and the Bondholder Defendants have security interests in the Debtor's accounts. Medford's security interest expressly extends to proceeds of accounts; the Bondholder Defendants' security interest, though not expressly extended to proceeds of accounts, nonetheless continues in such accounts by operation of law: G.L. c. 106, §§ 9–203(3) ("Unless otherwise agreed a security agreement gives the secured party the rights to proceeds provided by section 9–306.") and 9–306(2) ("Except where this Article otherwise provides, a security interest … continues in any identifiable proceeds including collections received by the debtor."). Nothing in the UCC's definitions of "accounts" and "pro-

ceeds" excludes insurance claims from their purview. The Debtor's Health Insurance Claims are proceeds of accounts within the meaning of those definitions.

■ The Committee argues that Article 9 does not apply to the Defendants' security interests in the Health Insurance Claims because, though the Claims are proceeds of accounts, they are also "claims under policies of insurance" within the meaning of § 9–104(g), and, as such, are excluded by that section from the application of Article 9. Section 9–104(g) states: "This Articles does not apply to a transfer of an interest in or claim in or under any policy of insurance, except as provided with respect to proceeds (section 9–306) and priorities in proceeds (section 9–312)." The Health Insurance Claims at issue here are proceeds, so the issue arises: are the Health Insurance Claims among the proceeds for which § 9–104(g) makes exception? The Defendants say that they are, because the exception encompasses all "proceeds" within § 9–306's definition of proceeds, and the first sentence of § 9–306(1) states that " '[p]roceeds' includes whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds," a definition that, for the reasons explained in the previous paragraph, includes the Health Insurance Claims. The Committee disagrees and contends that § 9–104(g) excepts only the proceeds described in the second sentence of § 9–306(1),[9] the only sentence in that subsection that deals expressly and specifically with insurance; in relevant part, the second sentence states that "[i]nsurance payable by reason of loss or damage to the collateral is proceeds." The Committee contends that the Health Insurance Claims

---

7. G.L. c. 106, § 9–106 (defining "account" as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance").

8. G.L. c. 106, § 9–306(1) (" 'Proceeds' includes whatever is received upon the sale,

exchange, collection or other disposition of collateral or proceeds.").

9. The second sentence states: "Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement." G.L. c. 106, § 9–306(1).

are not payable by reason of loss or damage to the patient accounts or any other collateral.

The Court agrees with the Defendants that the Health Insurance Claims are among the proceeds for which § 9–104(g) makes exception. I reach this conclusion for two reasons. First, as I explained above, the Health Insurance Claims are proceeds of patient accounts, as "proceeds" is defined in the first sentence of § 9–306(1). Second, the second sentence of § 9–306(1) was meant only to be inclusive, not to exclude insurance claims that are payable by reason other than loss or damage to the collateral. U.C.C. § 9–306, "Official Reasons for 1972 Change," in M.G.L.A. at c. 106, § 9–306 (1999) ("The new second sentence of subsection (1) is intended to overrule various cases to the effect that proceeds of insurance on collateral are not proceeds of the collateral."). The history of § 9–104(g) shows that the 1972 change to subparagraph (g)—which added the phrase "except as provided with respect to proceeds (section 9–306) and priorities in proceeds (section 9–312)"— was intended to "reflect ... the fact that, while transfers of claims under policies and deposit accounts are in general excluded from the Article by this section, *proceeds claims thereto are subject to section 9–306.*" U.C.C. § 9–104, "Official Reasons for 1972 Change," in M.G.L.A. at c. 106, § 9–104 (1999) (emphasis added). This comment, like subparagraph (g) itself, speaks of proceeds in general and not exclusively of "insurance payable by reason of loss or damage to the collateral." Therefore, the reference in § 9–104(g) to proceeds is properly construed as a reference to all insurance claims that constitute proceeds within the meaning of the first sentence of § 9–306(1). The Debtor's Health Insurance Claims are proceeds within the meaning of that sentence. Therefore, Article 9 applies to the Defendants' security interests on those claims; and, having been perfected in accordance with Article 9, those security interests are perfected and enforceable against the estate.

However, even if the Health Insurance Claims were not proceeds within the meaning of §§ 9–104(g) and 9–306, and therefore were excluded by § 9–104(g) from the application of Article 9, it would not necessarily follow that the security interests were invalidly granted or invalidly perfected. Section 9–104's exclusion of certain security interests from the applicability of Article 9 does not render the excluded security interests invalid or unperfectable. Rather, it merely requires that the validity and perfection of the security interest be determined by recourse to other law. G.L. c. 106, § 9–104 ("This article does not apply to...."); U.C.C. § 9–104, Official Comment on 1972 Revision, in M.G.L.A. at c. 106, § 9–104 (1999) ("Rights under life insurance and other policies, and deposit accounts, are often put up as collateral. Such transactions are often quite special, do not fit easily under a general commercial statute *and are adequately covered by existing law.*" (emphasis added)). In this instance, the Debtor and Defendants intended to create security interests in the Health Insurance Claims; their respective security agreements clearly reflected that intent; and the Defendants perfected their security interests in the manner prescribed for accounts by Article 9, which (whether Article 9 applies or not) is well-calculated to put the world on notice of the existence of the security interests. The Committee has cited no law (aside from the federal statutes discussed below) that they contend would invalidate these security interests or require something more for their valid perfection. Therefore, and because (as I explain below) the federal statutes do not prohibit the granting of a security interest in the Federal Insurance Claims, I conclude that even if the Defendants' security interests in the Health Insurance Claims are not governed by Article 9, they are nonetheless valid and enforceable against the estate.

**5. Security Interests in Federal Insurance Claims Under the Anti–Assignment Statutes**

 The Committee's final argument is that three federal anti-assignment statutes—42 U.S.C. §§ 1395g(c), 1395u(b)(6), and 1396a(a)(32)—prohibit the Debtor from assigning as a security interest its rights to payment under the Medicare and Medicaid programs and thereby render invalid the Defendants' security interests in the Federal Insurance Claims. The Defendants respond that the anti-assignment statutes contain no absolute prohibition on the granting of security interests and are intended to prohibit only assignments to factors and collection agencies, which implicate considerations that straight security interests do not.

The Court agrees that the three statutes do not prohibit health care providers from granting security interests in their receivables under the federal programs. In fact, the statutes contain no prohibition whatsoever on the assignment of claims. Rather, each operates by prohibiting the governmental insurer itself from making payments under its program to anyone other than the service provider (and, in §§ 1395u(b)(6) and 1396a(a)(32), the individual to whom service was provided). *Danvers Pathology Associates, Inc. v. Atkins,* 757 F.2d 427, 430 (1st Cir.1985) (§ 1396a(a)(32) was intended to stop the practice of factoring and accomplishes this by prohibiting payment to those who are not providers). The three statutes contain variants on essentially the same operative language. Section 1395g(c) states:

> No payment which may be made to a provider of services under this subchapter for any service furnished to an individual shall be made to any other person under an assignment or power of attorney[.]

42 U.S.C. § 1395g(c). Section 1395u(b)(6) states:

> No payment under this part for a service provided to any individual shall ... be made to anyone other than such indi-

vidual or ... the physician or other person who provided the service[.]

42 U.S.C. § 1395u(b)(6). And § 1396a(a)(32) states:

> A State plan for medical assistance must—(32) provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise[.]

42 U.S.C. § 1396a(a)(32).

Nothing in these statutes prohibits the Debtor, as provider, from granting a security interest in its receivables under these programs or invalidates such security interests. By prohibiting the governmental insurer from making payment on the receivables to anyone other than the Debtor, the statutes may impair the Defendants' ability to seek payment on the receivables from the governmental insurer without the provider's cooperation, but that cooperation may well be available, and the statutes *do not impair the Defendants' ability to enforce their security interests once payment has been issued.* In short, the anti-assignment statutes neither invalidate the Defendants' security interests in the Federal Insurance Claims nor effectively reduce them to a nullity.

***Conclusion***

For the reasons set forth above, judgment will enter dismissing the complaint on its merits and dismissing Medford's counterclaim without prejudice.